**ST. LUKE'S HOSPITAL ASSOCIATION OF CLEVELAND, OHIO, OF the METHODIST CHURCH, a non-profit corporation, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 15393.**

United States Court of Appeals Sixth Circuit.

June 18, 1964.

Argued by Frederick E. Youngman, Dept. of Justice, Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Fred E. Youngman, Attys., Dept. of Justice, Washington, D. C., on the brief, Merle M. McCurdy, U. S. Atty., Bernard J. Stuplinski, Asst. U. S. Atty., Cleveland, Ohio, for appellant.

Argued by Timothy F. McMahon, Cleveland, Ohio, Thompson, Hine & Flory, William H. Wallace, Cleveland, Ohio, on the brief for appellee.

Before MILLER, PHILLIPS and EDWARDS, Circuit Judges.

158

EDWARDS, Circuit Judge.

Plaintiff-Appellee—a Cleveland hospital—filed suit in the United States District Court for the Northern District of Ohio to recover $19,301.39 from Defendant-Appellant, United States of America. This amount represents Federal Insurance Contributions Act (Social Security) taxes and interest thereon assessed against the hospital and paid by it under protest. The assessment was based upon the employment by the hospital of "residents." The hospital claimed these residents were "doctors-in-training" and as such were exempt under an amendment to the Federal Insurance Contributions Act which, in its terms, exempted "interns" from the statutory definition of "employment."

The language of the exemption relied on by the hospital follows:

"(13) service performed as a student nurse in the employ of a hospital or a nurses' training school by an individual who is enrolled and is regularly attending classes in a nurses' training school chartered or approved pursuant to State law; and service performed as an intern in the employ of a hospital by an individual who has completed a 4 years' course in a medical school chartered or approved pursuant to State law;" Title 26 U.S.C. § 3121 (b) (13).

The basic facts were stipulated. The most pertinent portion of them we set out below:

"The taxpayer filed a timely claim for refund of the additional employment taxes and interest paid by it in the sum of $19,301.39 which subsequently was denied by the Commissioner of Internal Revenue prior to the commencement of this action. Such additional taxes were computed upon the allowances made by the taxpayer to those graduate physicians who, having completed a year of internship, were taking their second year or a subsequent year of in-hospital training in one of the approved programs conducted by St. Luke's Hospital for training in a medical specialty."

At the trial before a Federal District Judge the hospital produced a number of doctor witnesses who testified to the fact that since 1939, when Congress exempted "interns," that the program of use of "residents" had expanded rapidly. The tenor of their testimony was to the effect that interns of a one-year variety and "residents-in-training" for two to four years were all doctors-in-training and should, for purposes of exemption from the Act, be considered "interns." The District Judge gave an accurate summary of this testimony:

"Plaintiff's principal witnesses were men of the medical profession. They testified that at or around the year 1939 the ordinary and accepted meaning of the word 'intern' was the same as the ordinary and accepted meaning of the word 'resident,' or 'resident-in-training,' and that they were both understood to be graduates of a medical school who were in residence in the hospital for additional education and training without regard as to whether it was the first or subsequent years of such training; that the generally accepted meaning of the word 'intern' included a 'resident' or 'resident-in-training.' These doctors admitted that within the medical profession a distinction was made between an intern and a resident (in 1939 plaintiff hospital had different applications for the positions of intern and resident), but stated that the public failed to have, or understand, that delineation." St. Luke's Hospital Association of Cleveland, Ohio v. United States, 212 F.Supp. 387, 390 (N.D.Ohio 1962).

The government called one witness, a Doctor Weiskotten, who testified in relation to the situation prevailing in 1939 or earlier:

"Q. Do you have, Doctor, an opinion as to what was the generally

accepted meaning of the word 'intern' when used in the context of a hospital internship?

"A. Yes. That is, the internship was an approved educational and experience program to better prepare a man to initiate the practice of medicine following his four years as a student in a medical college.

"Q. Doctor, do you have an opinion as to what was the generally accepted definition of the word 'resident' when used in the context of the medical field?

"A. Yes. A resident was a man who took special hospital training of varying periods of time following an internship, to prepare him as a specialist in a particular field of medicine.

\* \* \* \* \* \*

"Q. Doctor, in your opinion, was there a sharp distinction in 1939 between those persons referred to as 'interns,' and those persons referred to as 'residents'?

"A. Oh, yes.

"Q. Would you please explain, once again, what that distinction was?

"A. I believe, as I stated before, that the internship was a training period, usually of one-year duration, following the four-year course in a medical school, to prepare a man to initiate a career in medicine. Now he might initiate that career in medicine by simply going out into independent practice, or he might initiate that career in medicine thereafter by taking a residency and becoming a specialist.

"Q. In other words, what you are saying is that the internship was a pre-condition to the general practice of medicine?

"A. To anyone who entered into the practice of medicine."

The District Judge gave a judgment for the hospital. His careful and well-reasoned opinion argued that the word

"intern" in the applicable statute should be construed as encompassing "residents-in-training." He based this conclusion first on the fact that although the terms "intern" and "resident" had totally different meanings in medical and hospital circles in 1939 when the amendment excluding interns was passed, this was not true in relation to the usage of the terms in the public vocabulary. And he held that it was the congressional intent to apply the public rather than the specialized meaning.

His opinion indicates that he was influenced to this conclusion in part by two amendments affecting the Federal Insurance Contributions Act passed in 1947 which exempted from the FICA definition of "employment" services performed by certain individuals.

The language he referred to follows:

"(iv) by any individual as an employee included under section 2 of the Act of August 4, 1947 (relating to certain interns, student nurses, and other student employees of hospitals of the Federal Government; 5 U.S.C., sec. 1052);" Title 26 U.S.C. § 3121(b) (6) (C) (iv).

"§ 1052. *Student-employees exempt from Classification Act of 1923*

"The Classification Act of 1923, as amended and extended, shall not apply to student nurses, medical or dental interns, residents-in-training, student dietitians, student physical therapists, and student occupational therapists, assigned or attached to a hospital, clinic, or medical or dental laboratory operated by any department, agency, or instrumentality of the Federal Government, or by the District of Columbia, and any other student-employees, assigned or attached to any such hospital, clinic, or laboratory primarily for training purposes, who may be designated by the head of such department, agency, or instrumentality, or by the Commissioners of the District of Columbia, as the case may be, with the ap-

proval of the Civil Service Commission." Title 5 U.S.C. § 1052.

Noting that the terms "intern" and "resident-in-training" in § 1052 were used separately, he nonetheless reasoned that both were included under the single term "intern" in the reference language of § 3121(b) (6) (C) (iv).

He also noted that doctors in private practice were exempted and stated:

"The span of most residency programs is from one to four years. It is most difficult to accept an interpretation of the statute which would result in exemption of the medical graduate for his first year of in-hospital training and during his entire professional life as a self-employed physician, and yet include him within the scope of the Social Security Act for the interim period of his residency." St. Luke's Hospital Association of Cleveland, Ohio v. United States, supra 212 F.Supp. at 393.

■ The District Judge also held that the amounts paid by the hospital to its residents-in-training were wages within the meaning of the Federal Insurance Contributions Act and not "gratuities" as contended by plaintiff-appellee hospital.

Defendant-appellant, United States of America, appealed to this court claiming that the District Judge's decision represented an erroneous interpretation of the language of the FICA quoted above.

With the District Judge's last finding we are in agreement. Residents on this record clearly perform very valuable services, and the sums paid them are "wages" and are not "gratuities." See United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947).

As to the interpretation of the 1939 amendment, we are unable to agree—albeit we recognize that reasonable minds could easily differ on issues of interpretation as finely spun as these.

It is clear to us from this record that there have been major changes in the nature and extent of the resident-in-training programs between 1939 and the present.

■ But we agree with the District Judge that proper rules of interpretation require us to view the language of this 1939 statutory amendment in the light of 1939 facts and meanings. Platt v. Union Pacific R. R. Co., 99 U.S. 48, 64 (1878); Hartford Electric Light Co. v. Federal Power Commission, 131 F.2d 953, 964 (C.A. 2 1942), cert. denied, 319 U.S. 741, 63 S.Ct. 1028, 87 L.Ed. 1698 (1942).

In 1939 many prominent medical schools required a period of internship for one year before they would confer the degree of Doctor of Medicine. The stipulation of facts in this record recites on this point:

"6. That in 1939, the following listed medical schools required a period of internship before conferring the degree of Doctor of Medicine upon persons who had completed the prescribed course of study:

"University of California Medical School; College of Medical Evangelists; University of Southern California School of Medicine; Stanford University School of Medicine; Loyola School of Medicine; Northwestern University Medical School; University of Illinois College of Medicine; Louisiana State University Medical Center; Wayne University College of Medicine; University of Minnesota Medical School; Duke University School of Medicine; University of Cincinnati College of Medicine; Marquette University College of Medicine; University of Manitoba Faculty of Medicine; Dalhousie University Faculty of Medicine; McGill University Faculty of Medicine; University of Montreal Faculty of Medicine. * * * "

In 1939 many states required a period of one year's internship before they would admit a doctor to practice medicine in their jurisdictions:

"Alabama; Alaska; Delaware; District of Columbia; Idaho; Illinois; Iowa; Louisiana; Michi-

gan; New Hampshire; New Jersey; North Dakota; Oklahoma; Oregon; Pennsylvania; Puerto Rico; Rhode Island; South Dakota; Utah; Vermont; Washington; West Virginia; Wisconsin and Wyoming."

Plaintiff hospital itself in 1939 had separate applications based on different qualifications for the posts of "intern" and "resident."

The "Application for Internship" called for listing the premedical school and the school of medicine and for a letter of recommendation from the Dean of the latter.

The "Application for Assistant Residency" (in addition to these same requirements) also required listing the hospital at which the applicant's internship had been served and the dates of the internship and a letter of recommendation "from the superintendent of the hospital where you are serving your internship."

In our view the term "intern" as used and understood by doctors and hospitals in 1939 generally referred to a medical student who was seeking a year of hospital training in order to complete his requirements for a medical degree and admission to practice.

The term "resident" as used by doctors and hospitals in 1939 referred to a graduate physician, licensed to practice medicine, who served on the staff of the hospital. He might be seeking further training for use ultimately in private practice, or he might be a regular staff physician.

It is clear, however, from this record that between 1939 and the date of hearing on this case some major developments have affected these terms.

The one-year internship is no longer a requirement either for a medical degree or for a license to practice medicine. And there has developed a broad program for training of physicians in specialized branches of medicine leading to examination and certification by specialty boards. The doctors involved in this program are the "residents-in-training" whose exemp-

tion or coverage under Social Security is the subject of this dispute.

Thus, since 1939 the distinction between interns and residents has been blurred in two respects—interns at present generally are graduate doctors and entitled to practice medicine—residents-in-training are perhaps more definitely regarded as still in training status than was true of their resident predecessors in 1939. Yet the basic description of the "intern" program (from 1939 through 1961) has been an educational experience in hospital service for one year immediately following four years of medical school. And the basic qualification stipulated for a residency is and has been (1939–1961) satisfactory completion of a one-year internship.

Defendant United States of America's first exhibit in this case is St. Luke's Hospital booklet entitled, Intern, Resident Programs 1960–61. From this exhibit we quote portions which show the distinctions which plaintiff hospital was making in the years noted as to the very words in controversy in this appeal.

In the section of the booklet entitled "Rotating Intern Program" we find the following:

"Appointment Procedure

"Saint Luke's Hospital offers twenty-four one-year rotating internships, with service beginning on June 25 and ending June 25 of the following year. This hospital participates in the National Intern Matching Program.

"Selection of appointees to internships is made by the superintendent of the hospital in conference with and upon the advice of the house staff committee of the medical staff and the approval of the medical council. All appointments are confirmed by the executive committee of the Board of Trustees.

"Appointments are made after completion of the junior year of the medical course. Interns are selected on the basis of information supplied in the application, scholastic records,

letters of recommendation and, if possible, personal interview."

\* \* \* \* \* \*

"Educational Objectives and Methods

"It is the purpose of the internship to provide a well-rounded educational opportunity. The rotation is designed to allot an appropriate amount of time on each of the major services with a minimal amount of interservice shifting and few short-term services. The schedule is arranged primarily for the benefit of the interns, not for the convenience of the staff or the administration. The intern's preferences are taken into consideration in planning the rotation. Since more than one-half of the interns desire to remain at Saint Luke's for an approved residency training, each of them is asked to state the specialty or specialties in which he is interested. His first assignment is then made to the appropriate service, if possible. In this manner he has opportunity to become acquainted with that service, and the staff of the service can evaluate him before it is time to make the residency appointments."

In the section of the booklet entitled "The Resident Programs," we find:

"Saint Luke's Hospital offers a training program for residents in each of the following specialties: anesthesiology, general surgery, internal medicine, obstetrics and gynecology, ophthalmology, orthopedic surgery, otorhinolaryngology, pathology, pediatrics and radiology. All of these residencies are approved by the Council on Medical Education and Hospitals of the American Medical Association and by the respective specialty boards.

\* \* \* \* \* \*

"Advanced training in the various specialties is available to those who have completed one year of internship. In selection of appointees for these positions, preference is given those who have served as interns at Saint Luke's Hospital and those who are advancing in the residency sequence. Graduate interns from other hospitals are eligible for appointment, provided they have had training equivalent to that offered by Saint Luke's Hospital."

It is also interesting to note that the tax problems of Ohio hospitals concerning "interns" and "residents" have been before the Ohio Supreme Court. Doctor's Hospital v. Board of Tax Appeals, 173 Ohio St. 283, 181 N.E.2d 702 (1962). In its opinion in this case the Ohio Supreme Court defined the terms in this fashion:

"An intern is a medical student who has completed his medical school course; he may or may not have been licensed as a physician at the time of beginning his internship. His internship lasts usually one year, and during such internship he assists the hospital in the care of patients, without a charge being made to the patient for such services.

"A resident-in-training is a licensed physician who has completed his medical school course and his internship and who becomes associated with a hospital for a period usually of three years for the purpose of advanced study looking toward specialization in the practice of medicine. During this period, he also assists the hospital in the care of patients, without charge to the patient therefor." Doctor's Hospital v. Board of Tax Appeals, supra 173 Ohio St. at 283–284, 181 N.E.2d at 703.

While these definitions are certainly not controlling as to our interpretation of a federal statute, they seem entirely consistent with the record in this case.

We recognize, of course, that in all the above we have concerned ourselves with the definitions of the word "intern" as it was and is used by doctors and hospitals, and that it was this usage which the

Federal District Judge rejected in favor of a more general definition.

There is no doubt that "intern" does have an older and more general meaning found in dictionaries, which would include any person residing in an institutional setting for educational or training purposes. Thus, in its older and less specific meaning, the word "intern" was the opposite of "extern."

Contrary, however, to the view of the matter taken by the Federal District Judge, we believe that in 1939 Congress was thoroughly familiar with and had every intention of using the newer, the more specific, and by then the more common definition of the word "intern."

First, the language involved was embodied in an exception to the definition of employment. Thus it was specifically addressed to prospective "interns" and to the employers of "interns," i. e. the hospitals of the United States, who were, as indicated above, thoroughly familiar with the newer and more technical definition.

Congressional committees which draft amendments to federal legislation acquire a definite expertise which certainly extends in our opinion to knowing the difference between an intern and a resident, or between an intern and a resident-in-training.

A House Ways and Means Committee Report dealing with identical language in the Social Security Act [1] to that which we construe herein said:

"Paragraph (13) excepts service performed as a student nurse in the employ of a hospital or a nurses' training school by an individual who is enrolled and is regularly attending classes in such a school chartered or approved pursuant to State law; and service performed as an intern (as distinguished from a resident doctor) in the employ of a hospital by an individual who has completed a 4 years' course in a medical school chartered or approved pursuant to State law." H.R.Rep.No. 728, 76th Cong., 1st Sess. 49 (1939).

While here in 1939 a Congressional Committee was using the term "intern" in contradistinction to the term "resident," as the "resident-in-training" language came into greater use, we find Congress employing this term (along with the term "intern") with obvious understanding of their meaning in medical and hospital usage.

In 1947 an amendment to the Classification Act of 1923 was adopted which provided in so many words that it should "not apply to student nurses, medical or dental interns, residents-in-training," [2] etc.

Nor can we agree with the District Judge that the parallel statutory reference [3] to Section 1052 encompasses the term "resident" in the term "intern." On the contrary we believe that the general and inclusive terminology is that of "students-in-training."

There is, of course, a principle of statutory construction which suggests that wherever possible interpretations of statutes should be avoided which produce absurd or unreasonable results. United States v. American Trucking Associations, Inc., 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345; 50 Am.Jur., Statutes, § 377 at 385. Appellee hospital argued successfully before the District Judge and vigorously before us to the effect that to require coverage of residents-in-training was unreasonable because it would require them to pay for something which under no circumstances would ever be of any benefit to them.

At oral argument certain hypothetical questions were posed from the bench to counsel for the hospital and the government to which answers have subsequently

1. Title 42 U.S.C. § 410(a) (13).

2. Title 5 U.S.C. § 1052.

3. "(iv) by any individual as an employee included under section 2 of the Act of August 4, 1947 (relating to certain interns, student nurses, and other student employees of hospitals of the Federal Government; 5 U.S.C., sec. 1052);" Title 26, U.S.C. § 3121(b) (6) (C) (iv).

been supplied by each and are included in the appendix to this opinion. It is apparent from these answers that Social Security coverage does have a definite beneficial value in terms of insurance for the married residents-in-training in the benefits provided for himself in terms of disability and to his family in the event of his death. It also is obvious from the figures supplied by the government response that far more doctors achieve full and permanent coverage under Social Security than is commonly thought to be the case. While such facts are by no means determinative of the statutory interpretations with which we are dealing, they serve to rebut the suggestion that coverage for the persons who are the subject matter of this dispute is absurd.

█ Finally, in dealing with the beneficent purposes of the Social Security Act, this court generally favors that interpretation of statutory provisions which calls for coverage rather than exclusion. Brown & Bartlett v. United States, 330 F.2d 692 (C.A. 6 1964); Lietz v. Flemming, 264 F.2d 311 (C.A. 6 1959).

█ In all of the above we do not ignore the fact that distinctions between interns and residents-in-training have been substantially reduced in the years since 1939. The resident training program has been greatly expanded and its educational aspects have been greatly enhanced. No doubt these developments lend some weight to the argument for expansion of the intern exemption to cover residents-in-training. It seems clear to us, however, that meeting these changed conditions, if indeed there is warrant for doing so at all, is the function of legislation and not that of judicial interpretation.

Reversed and remanded for entry of judgment for defendant United States of America.

## APPENDIX "A"

Counsel for Defendant-Appellant, United States of America, forwarded the attached letter in response to the court's questions.

### DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

6401 Security Boulevard
Baltimore 35, Maryland
March 4, 1964

Hon. Louis F. Oberdorfer
Assistant Attorney General
Department of Justice
Tax Division
Washington 25, D. C.

Attention: Mr. Frederick Youngman

Re: St. Luke's Hospital of Cleveland v. United States—(No. 15,393, C.A.6th) (Your ref: LFO: LAJ:FEY 5-57-2586)

Dear Mr. Oberdorfer:

Thank you for your letter of February 24. The additional copy of the Social Security Handbook you requested is enclosed.

Your letter lists three factual situations, as to each of which the Court of Appeals wishes to know the social security benefits that would accrue to a doctor's survivors. In each situation the doctor will have served a period of years in in-hospital training subject to social security tax, gone into the private practice of medicine, and then died two years later. In the first situation, the doctor will have served three years in training, in the second, four years, and in the third, seven years. You suggest that we explain what disability benefits would be available in each of these cases if the doctor became disabled, instead of died, two years after entering private practice. The answers to the questions presented would depend, in part, upon facts in addition to those suggested by the court. The discussion below will show why:

Survivor benefits are payable to the widow and certain children of an individual if he dies "fully insured" or "currently insured." Generally, an individual is "fully insured" if, *for* each full calendar year after 1950 or after the year in which he attained age 21 (whichever is later)

and before the year in which he died he has at least one quarter of coverage, i. e. a calendar quarter in which he has been paid at least $50 in wages or credited with at least $100 in self-employment income. He also must have a minimum of six quarters of coverage. These quarters of coverage can be acquired at any time after 1936. An individual is "currently insured" if he has at least six quarters of coverage *in* the 13 calendar quarter period ending with the quarter in which he dies or becomes entitled to disability insurance benefits. (Sections 213(a) and 214 of the Social Security Act, 42 U.S.C. §§ 413(a), 414).

Applying these definitions in each of the listed cases, the results are as follows: If the doctor dies two years after going into private practice he will not have died "currently insured" because he would have then only five of the last 13 quarters as quarters of coverage. On the other hand, if he dies a year and a half after going into private practice, he will have died "currently insured" because seven of the last 13 quarters are quarters of coverage.

Whether or not the doctor in each of the listed cases would be "fully insured" when he dies depends upon the year in which he dies and his age at that time. Let us assume that in each case he commenced his residency at age 26, and dies this year, 1964. In the first case he would be 31 at death. He would need nine quarters of coverage, one for each year after 1954 and before 1964. His three years of covered training would have given him 12 such quarters. In the second case he would be 32 at death. He would need ten quarters of coverage, one for each year after 1953 and before 1964. His four years of covered training would have given him 16 such quarters. In the third case he would be 35 at death. He would need 13 quarters of coverage, one for each year after 1950 and before 1964. His seven years of covered training would have given him 28 such quarters. In each case, then, the doctor would have died "fully insured."

Further, the doctor would still have died "fully insured" in the first case if he had been in private practice not two, but five years. In the second case he would still have died "fully insured" if he had been in private practice eight years; and in the third case, if he had been in private practice 15 years.

When an individual dies "fully insured" or "currently insured" the following benefits will be payable:

1. Monthly benefits to each of his dependent children until the child attains age 18 (if the child becomes disabled before age 18, then for so long as the disability lasts) or sooner marries (section 202(d) of the Act, 42 U.S.C. § 402(d));

2. Monthly benefits to his widow so long as she has in her care a child of the individual entitled to child's benefits, unless she remarries (section 202(g) of the Act, 42 U.S.C. § 402(g)); and if she remains his unremarried widow, she can again qualify for monthly benefits at age 62 (section 202(e) of the Act, 42 U.S.C. § 402(e));

3. In certain cases (and only if the individual died "fully insured"), monthly benefits to his aged dependent parents (section 202(h) of the Act, 42 U.S.C. § 402(h));

4. A lump-sum death payment, not to exceed $255 (section 202(i) of the Act, 42 U.S.C. § 402(i)).

The amount of such monthly benefits and lump-sum would in each case be computed from the individual's earnings under social security in accordance with a statutory formula (sections 202(d), (e), (g), and (h) and 215 of the Act, 42 U.S.C. §§ 402(d), (e), (g), (h), 415).

For an individual to be entitled to disability insurance benefits for any month it is necessary not only that he be "fully insured," but in addition that he have not less than 20 quarters of coverage during the 40 calendar quarters ending either with the quarter in which that month occurs, or with a subsequent quarter. Thus, in neither the first nor the second situations could the doctor be entitled to disability insurance benefits; in the

**166**

third he would. Moreover, if he himself became entitled to disability insurance benefits, his wife and children also could become entitled to benefits.

To analogize the situations here to commercial insurance, what the doctor would receive in each case would be comparable to the protection given by term insurance: for the duration of the term —which is longer as he engaged for a longer time in employment or self-employment covered under the Act—he and his family are protected.

In presenting the above, we have limited ourselves to the situations presented by the court and by you, which assume that the doctors in question earned social security coverage only while in residency. This assumption overlooks the fact that a large number of doctors serve with the armed forces, during which time they acquire additional quarters of coverage, which in turn increases the protection for their families and themselves.

We quote also from a medical publication, Medical World News, of September 15, 1961, entitled "Many Doctors Already Have Social Security," which may be of interest too relative to the extent to which doctors have social security coverage:

> "In the long running controversy over Social Security coverage for doctors, one rather remarkable fact has been generally overlooked: 40 per cent of the nation's working physicians are already on the active rolls. And more than 60 per cent have some credits.
>
> "Many are hospital staff physicians who voted in favor of Social Security coverage for themselves * * *. And they did this even though non-profit institutions are ordinarily excused from participation in the Social Security program. Others are Federal employees, teachers, administrators, or private physicians with part-time salaried positions."

We hope the foregoing will be of assistance to you in answering the questions of the court. If we can be of further service, please let us know.

Sincerely yours,

/s/ HAROLD P. PACKER
HAROLD P. PACKER
*Assistant General Counsel*

Enclosure

———

*APPENDIX "B"*

Counsel for Plaintiff-Appellee, St. Luke's Hospital Association of Cleveland, Ohio, forwarded the attached letter in response to the court's questions.

LAW OFFICES OF
THOMPSON, HINE AND FLORY
NATIONAL CITY BANK BUILDING
CLEVELAND 14, OHIO
CHERRY 1–1880
February 22, 1964

Hon. Shackelford Miller, Jr.
Hon. Harry Phillips
Hon. George Edwards

> Re: St. Luke's Hospital Association of Cleveland, Plaintiff-Appellee v. United States of America, Defendant-Appellant United States Court of Appeals for the Sixth Circuit, Case No. 15,393

Honorable Judges:

During the course of oral argument heard on February 18th the Court of Appeals, through Judge Edwards, requested counsel for the parties to submit separate letter responses to the following alternative hypothetical questions:

(1) Assume that a medical school graduate pursues in-hospital training for three years. Assume that prior to his death he becomes married and has one minor child. At the expiration of his in-hospital training he engages in the practice of medicine as a self-employed physician who is exempt from participation in the Social Security Benefit program. Assume further that he dies at the end of his second year of private practice. What Social Security benefits are applicable and allowable on behalf of the surviving widow and minor child?

(2) Assume the same state of facts as in (1) above except that the medical school graduate pursues five years of in-hospital training.

(3) Assume the same state of facts as in (1) above except that the medical school graduate pursues seven years of in-hospital training.

In order to discuss and answer these hypothetical questions it is necessary to make certain additional and basic assumptions. In this regard we have assumed, as being normal, that the decedent (a) graduated from high school at the age of 18 (b) that he graduated from college at the age of 22 (c) that he attended an approved medical school and graduated at the age of 26, and (d) that he immediately commenced in-hospital training.

We have also assumed application of the Internal Revenue Service determination as made and contested in this case; the same concluding that exclusion from "employment" pursuant to Section 3121 (b) (13) of the F.I.C.A. shall be applied only "to basic (first-year) post-graduate training" (see Internal Revenue Service letter dated June 16, 1958, Plaintiff Exhibit A, R.56b–58b).

The pertinent Social Security benefits provided under the Act may be summarized as follows:

(1) *Old Age Insurance Benefits.* The conditions of entitlement to such benefits, whether individual, wife's or child's, as provided for in Regulation Sections 404.-303 et. seq. (Subpart D of Regulations No. 4 of the Social Security Administration—Commerce Clearing House Unemployment Insurance Reporter, Volume I, Sections 13,105 et. seq.) require that the applicant shall have attained age 65 and have an insured status. Under the assumed facts, no Social Security benefits of these types would accrue in any of the hypothetical situations posed by the Court.

(2) *Mother's (Widow) Insurance Benefits.* Are covered by Regulation Sections 404.325, 404.326 and 404.327 (C.C.H. Sections 13,149, 13,151 and 13,-153). This benefit must be considered in answer to the Court's hypothetical questions. As provided in Section 404.327 the benefit is computed as a monthly "amount equal to three-fourths of the primary insurance amount of the deceased individual."

(3) *Child's Insurance Benefits.* Are covered by Regulation Sections 404.312 through 404.318 (C.C.H. Sections 13,123–13,135). This benefit would also amount to three-fourths of decedent's primary insurance amount (Section 404.314).

(4) *Lump-Sum Death Payments.* This benefit is computed as three times the primary insurance amount, but in no case exceeds $255.00 (Section 404.343).

The following additional Regulation Sections must be considered in evaluating "eligibility" and applied in order to answer the Court's hypothetical questions:

*Subpart B of the Regulations,* Section 404.101, et seq. (C.C.H. Section 13,011 et seq.) discusses "fully" and "currently" insured status as dependent upon the individual having acquired sufficient "quarters of coverage."

*Section 401.103 (b) (1)* specifically provides that an individual must be paid $50.00 or more during a quarter to be credited with a "quarter of coverage" (C.C.H. Section 13,015).

*Section 401.103(f)* provides that a quarter of coverage is acquired as of the day in that calendar quarter on which the wages are paid or earned (C.C.H. Section 13,015).

*Sections 404.108 and 404.109* detail the requirements for determination of the "fully insured" status of an individual, after July, 1961. To be "fully insured" an individual needs one quarter of coverage for each year elapsing after 1950 or after the year in which he attained age 21, if later, and before the year in which he died. In all instances at least six quarters of coverage are required (C.C.H. Sections 13,022 and 13,022A).

*Section 404.114* defines the "currently insured" status. A currently insured individual is one who has acquired not

less than six quarters of coverage during the 13-quarter period ending with and including the quarter in which he died (C.C.H. Section 13,027).

*Answer to Hypothetical Question No. 1*

It appears clear that the Old Age Insurance Benefits are inapplicable in decedent's case. However, the possibility of allowance of Mother's, Child's and Lump-Sum Death Benefits (as dependent upon either a "currently" or "fully" insured status) must be examined and discussed.

We submit the hypothetical facts establish that:

1. Decedent had no coverage during his first year of in-hospital training.

2. Thereafter, and because of contributions for six quarters, he acquired a "currently insured" status by the end of two and one-half years of training. This status terminated at the end of one and three-quarter years (seven quarters) of his private practice as a physician.

3. During his second and third years of in-hospital training he accumulated eight quarters of coverage. This entitled him to a "fully insured" status for eight years after he attained 21 years of age. When he became 29 years of age, depending upon his birth date, he was either in his last year of in-hospital training or starting his first year of private practice.

4. When he completed two years of private practice, and died at age 31, he had neither a "currently insured" nor a "fully" insured status.

5. Under the first hypothesis decedent's widow and child are not entitled to any Social Security benefits.

*Answer to Hypothetical Question No. 2*

Under the facts assumed with respect to this alternative hypothetical question (a total of five years in-hospital training, with contributions having been made during four years) the decedent's widow and minor child would be entitled to the Lump-Sum Death, Mother's and Child's Benefits, the allowances to be computed on his "primary insurance amount." We arrive at this conclusion because decedent would have acquired sixteen quarters of coverage on the basis of contributions made during the last four years of his in-hospital training; these sixteen quarters of coverage to be carried forward (from age 21) and applied for "fully insured" coverage during the two-year period of private practice. This "fully insured" status must be recognized, although his "currently insured" status terminated at the same time mentioned in our answer to hypothetical question No. 1.

*Answer to Hypothetical Question No. 3*

Essentially, our answer to hypothetical question No. 2 also applies to the Court's third hypothesis. Since the period of contribution is extended an additional two years, decedent's "fully insured" status is also extended. In this situation the widow and minor child would likewise be entitled to applicable Lump-Sum Death, Mother's and Child's Benefits.

We are mailing duplicate copies of this letter to Mr. Youngman, of counsel for Defendant-Appellant, and also transmitting additional file copies to Mr. Reuss.

Respectfully submitted,

/s/ TIMOTHY F. MCMAHON
TIMOTHY F. MCMAHON

/s/ WILLIAM H. WALLACE
WILLIAM H. WALLACE

*Of Counsel for Plaintiff-Appellee, St. Luke's Hospital Association*

/mp

cc: FRED E. YOUNGMAN, Esq.
CARL W. REUSS, Esq.