UNITED STATES of America Plaintiff,

v.

**MOUNT SINAI MEDICAL CENTER OF FLORIDA, INC., Defendant.**

**Nos. 02–22715–CIV.**

United States District Court,
S.D. Florida.

Jan. 25, 2005.

Grisel Alonso, Assistant United States Attorney, United States Attorney's Office, Southern District of Florida, Miami, FL, John M. Bilheimer, Trial Attorney, Deborah M. Morris, Trial Attorney, Tax Division, Department of Justice, Washington, DC, for Plaintiff.

Bruce Judson Berman, Esquire, Dianne O. Fischer, Esquire, McDermott Will & Emery, ·LLP, Miami, FL, Christopher Kliefoth, Esquire, James E. Smith, Esquire, Karla L. Palmer, Esquire, McDer-

mott Will & Emery, Washington, DC, for Defendant.

*AMENDED ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Corrects clerical errors only)*

GOLD, District Judge.

THIS CAUSE is before the Court upon Plaintiff United States of America's Motion for Summary Judgment **[DE # 46, filed September 24, 2004]**. On October 26, 2004, Defendant Mount Sinai Medical Center of Florida, Inc. filed a Response in Opposition to Defendant's Motion for Summary Judgment **[DE # 61]**. On November 5, 2004, the United States filed a Reply to Mount Sinai's Response in Opposition to the United States' Motion for Summary Judgment **[DE # 64]**.

Upon review of the record, the Motion for Summary Judgment, the Response, the Reply, and the applicable case law, I grant the United States' Motion for Summary Judgment.

## I. Factual and Procedural Background

### A. Procedural Background

The United States initiated this action by filing a one-count Complaint on September 18, 2002, in which the United States alleged that an erroneous refund of federal taxes and interest was paid to Mount Sinai, and that, pursuant to 26 U.S.C. § 7405, Mount Sinai is therefore liable to the United States for an aggregate erroneous refund of tax and interest in the amount of $2,450,177.32, plus further interest. The United States contends that the refunds of tax and interest at issue are Federal Insurance Contribution Act (FICA) taxes paid and withheld by Mount Sinai with respect to wages paid to medical residents during the sixteen calendar quarters ending from March 31, 1996 through

December 31, 1999, and subsequently ·refunded in response to Mount Sinai's claims for refund of the FICA taxes filed in 2000 and 2001. Mount Sinai claimed the refunds on the grounds that: 1) the fellowship grants and the amounts paid to residents in training were not "payment for services" within the meaning of 26 U.S.C. § 117(c); and 2) that the amounts paid to medical residents should have been excluded from FICA wages under the "student" exclusion contained in 42 U.S.C. § 410(a)(10) and in 26 U.S.C. § 3121(b)(10). In support of its claim that the FICA taxes were erroneously refunded, the United States asserts that the payments to medical residents: 1) were not excluded from the residents' gross income under 26 U.S.C. § 117(c); and 2) did not fall within the exception to the definition of employment set forth in 26 U.S.C. § 3121(b)(10) **[DE # 1]**.

### B. Undisputed Facts [1]

The tax periods at issue in this suit are all four calendar quarters for each of the years 1996 through 1999. (United States' Statement of Material Facts, **DE # 48**, at ¶ 6; Mt. Sinai's Response To Plaintiff's Statement of Material Facts, **DE # 62**, at ¶ 6).

A medical student is a person who is pursuing a course of study at a medical school and has not yet received a terminal medical degree (e.g., M.D., D.D.S., D.P.M.). A medical resident is a person who has received such a degree and is undergoing further training in a medical or dental specialty. An intern is a resident in his or her first year of training out of medical school. (United States' Statement of Material Facts at ¶ 2; Mt. Sinai's Response To Plaintiff's Statement of Material

Facts at ¶ 2). At any given time during the period covered by this lawsuit, Mt. Sinai had approximately 100 medical residents on its staff, divided into ten medical or dental specialties. The specialties and the approximate number of residents in each program are as follows:

| | |
|---|---|
| Internal medicine | 35 |
| Pathology | 8 |
| Radiology | 17 |
| General surgery | 18 |
| Dentistry | 4 |
| Podiatry | 2 |
| Sleep disorders | 2 |
| Cardiology | 9 |
| Emergency medicine | 5 |
| Plastic surgery | 2 |

(United States' Statement of Material Facts at ¶ 3; Mt. Sinai's Response To Plaintiff's Statement of Material Facts at ¶ 3). The residency program in emergency medicine *did not commence until 1998.* (Mt. Sinai's Response To Plaintiff's Statement of Material Facts at ¶ 3).

Defendant Mount Sinai is located in Miami Beach, Florida. (United States' Statement of Material Facts at ¶ 1; Mt. Sinai's Response To Plaintiff's Statement of Material Facts at ¶ 1). Mt. Sinai is one of six statutorily designated teaching hospitals in the State of Florida. Mt. Sinai has three primary purposes, patient care, education and medical research. (Mt. Sinai's Response To Plaintiff's Statement of Material Facts at ¶ 11). On Mt. Sinal's tax return for the years 1998 and 1999, Mt. Sinai stated that it was not a private foundation, but that it was a hospital, even though it also had the option to state that it was not a private foundation, but was a school. (July 19, 2004 Deposition of Alexander Mendez, **DE # 49**, at 111–12).

*The manual which Mt. Sinai gave to incoming medical residents states, "You*

---

1. The United States filed a Statement of Material Facts **[DE # 48]** in support of its Motion for Summary Judgment. Mount Sinai filed a Response To Plaintiff's Statement of Material

Facts **[DE # 62]**. This factual background section is taken from both documents as well as from my independent review of the record.

are now part of an organization dedicated to providing the best possible health care to our community.... *Patient care, our medical center's primary concern,* will be your major responsibility." (Emphasis added). (United States' Statement of Material Facts at ¶ 7; Mt. Sinai's Response To Plaintiff's Statement of Material Facts at ¶ 7).

All medical residents and fellows enrolled in Mt. Sinai's Graduate Medical Education Program for the years in question participated in numerous educational opportunities administered by Mt. Sinai. These opportunities included: 1) enrollment in a core curriculum prescribed by the Accreditation Counsel on Graduate Medical Education (ACGME) and implemented by Mt. Sinai, with patient care just one element of this curriculum; 2) clinical examinations and didactic evaluations with Mt. Sinai supervising and attending physicians; 3) conferences, many of which were conducted on a daily basis; 4) weekly grand round sessions in which all residents attended lectures on a pertinent area of medical treatment; 5) morbidity and mortality conferences examining particularly interesting cases for their educational opportunities; 6) graded examinations; and 7) textbook readings and participation in journal clubs in which residents read assigned journal articles and discussed them with their particular medical team. (Mt. Sinai's Response To Plaintiff's Statement of Material Facts at ¶¶ 7, 12). All of Mt. Sinai's Graduate Medical Education Program's activities were under the accreditation requirements of specific governing bodies, including the Accreditation Council for Graduate Medical Education, the American Osteopathic Association, and various other accreditation organizations. (Mt. Sinai's Response To Plaintiff's Statement of Material Facts at ¶ 15).

At all times, medical residents at Mt. Sinai were under the supervision of the program's attending physicians. At no point during any part of the residents' education at Mt. Sinai was any resident permitted to, without the input and supervision of an attending physician: 1) perform surgery; 2) prescribe a treatment plan; or 3) make a clinical or physiological determination. (Mt. Sinai's Response To Plaintiff's Statement of Material Facts at ¶ 15).

Medical residents at Mt. Sinai do not pay tuition or other fees to Mt. Sinai for the education or training they are receiving. (United States' Statement of Material Facts at ¶ 8; Mt. Sinai's Response To Plaintiff's Statement of Material Facts at ¶ 8). Salaries or stipends paid to residents were not negotiated on an individual basis, but were uniformly paid to all residents based on their post graduate year (PGY–1 being a first year resident (or intern), PGY–2 being a second year resident, etc.). (United States' Statement of Material Facts at ¶ 9; Mt. Sinai's Response To Plaintiff's Statement of Material Facts at ¶ 9). The salaries ranged from $28,000 for an intern (first year resident) for the year beginning in July 1995 to $44,120 for a seventh year resident for the year beginning in July 1999. (United States' Statement of Material Facts at ¶ 9; Mt. Sinai's Response To Plaintiff's Statement of Material Facts at ¶ 9). The salaries received by the defendant's medical residents are used for their ordinary living expenses. (United States' Statement of Material Facts at ¶ 10; Mt. Sinai's Response To Plaintiff's Statement of Material Facts at ¶ 10). The salaries received by residents were far less than any compensation they received for performing the same or similar services once they completed their residency program. (Mt. Sinai's Response To Plaintiff's Statement of Material Facts at ¶ 14).

Residents during the time period at issue were not limited to working 80 hours

per week, and some residents were spending more than 80 hours a week at the hospital performing patient care. (Deposition of Paul Katz, M.D., Ex. B to **DE** # **61**, at 30, 137, 287). Residents would have one day off out of seven. (Dr. Katz deposition, Ex. B to **DE** # **61**, at 58). Since the rule limiting residents from working more than 80 hours per week came into effect in 2003, Mt. Sinai hired more physicians' assistants to make up for the reduced amount of work which the surgical residents could perform. (Dr. Katz deposition, Ex. B to **DE** # **61**, at 136–38; April 14, 2004 Deposition of Dr. Juan Paramo, Ex. K to **DE** # **61** at 29–30, 64).

The residents during the time period at issue were covered by the same Mt. Sinai medical malpractice insurance policy that covered other physicians employed by Mt. Sinai as well as nurses and physician assistants employed by Mt. Sinai. (Mendez deposition, **DE** # **49**, at 53–54; Dr. Katz deposition, Ex. B to **DE** # **61**, at 304; Dr. Paramo deposition, Ex. K to **DE** # **61**, at 49). The residents during the time period at issue were covered under Florida's Workers' Compensation law. (Mendez deposition, **DE** # **49**, at 76; Dr. Katz deposition, Ex. B to **DE** # **61**, at 312; Dr. Paramo deposition, Ex. K to **DE** # **61**, at 56–57). During the time period at issue, Mt. Sinai provided residents with life insurance, free of charge, as well as disability insurance, free of charge. Other physician employees of Mt. Sinai had to contribute toward their life insurance coverage and their disability insurance coverage. (Dr. Katz deposition, Ex. B to **DE** # **61**, at 305–07). During the time period at issue, residents were allowed to participate in the Mt. Sinai retirement plan, but received no matching contributions from Mt. Sinai, unlike other Mt. Sinai employees, who did receive matching contributions from Mt. Sinai. (Dr. Katz deposition, Ex. B to **DE** # **61**, at 307–08; Dr. Paramo deposition, Ex. K to **DE** # **61**, at 49).

## II. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *Bishop v. Birmingham Police Dep't*, 361 F.3d 607, 609 (11th Cir.2004).

The moving party bears the initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997). Once the moving party satisfies this burden, the burden shifts to the party opposing the motion to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). A factual dispute is genuine only if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir.2001).

In assessing whether the movant has met its burden, the court should view the evidence in the light most favorable to the party opposing the motion and should resolve all reasonable doubts about the facts in favor of the non-movant. *Denney*, 247 F.3d at 1181. In determining whether to grant summary judgment, the court must remember that "[c]redibility determina-

tions, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

Upon review of the record and the parties' arguments, I conclude that, as a matter of law, medical residents do not qualify for the student exemption to FICA taxation, under 26 U.S.C. § 3121(b)(10). Moreover, Mt. Sinai concedes that the salaries paid to its medical residents are not exempt from FICA taxation as scholarship proceeds under 26 U.S.C. § 117. Accordingly, I find that summary judgment for the United States is appropriate.

### III. Analysis

■ In this erroneous refund suit, the United States bears the burden to show that: a) it issued a refund; b) the amount of the refund; c) the suit to recover the refund was timely; and d) the refund was erroneous. *See United States v. Commercial Nat'l Bank of Peoria,* 874 F.2d 1165, 1169 (7th Cir.1989). The parties do not dispute the first three elements. The United States has shown that the refund was mistakenly issued. *See* **DE # 47** at 33. Mt. Sinai's defense here is that the merits of the tax liability issue should be resolved in its favor.

This case presents the question whether medical residents employed by Mt. Sinai are exempt from social security taxes, under the student exemption to social security. The internal revenue code defines "employment" to mean "any service, of whatever nature, performed by an employee for the person employing him." 26 U.S.C. § 3121(b)(A). Mt. Sinai contends that any money paid to its medical residents is not "with respect to employment" because of the "student exception" from social security, which is found in 26 U.S.C. § 3121(b)(10), and excludes from "employment" services rendered for a "school, college, or university" by "a student who is enrolled and regularly attending classes at such school, college, or university." Mt. Sinai contends that it is a school, and that its medical residents are students, who within the student exception.

I do not accept Mt. Sinai's position. The student exception does not include its medical residents. Instead, as a matter of law, during the period at issue, medical residents were covered under the social security system, and they, and their employers, are subject to social security taxes. I find that, as a matter of law, medical residents are not students under the student exemption to social security and, therefore, their wages are subject to social security taxes.

### A. Coverage Under Social Security Is To Be Broadly Construed, and Exemptions From The Social Security Tax (FICA) Must Be Narrowly Construed

■ The exceptions to social security coverage, and social security taxes, are intended to be very limited. The Supreme Court has directed that the terms "employment" and "wages," as defined in 26 U.S.C. § 3121, be broadly construed. As the Court observed, "[t]he very words, 'any service ... performed ... for his employer,' with the purpose of the Social Security Act in mind, import a breadth of coverage." *Social Sec. Bd. v. Nierotko,* 327 U.S. 358, 365, 66 S.Ct. 637, 90 L.Ed. 718 (1946); *accord Mayberry v. United States,* 151 F.3d 855, 860 (8th Cir.1998); *see also Associated Electric Cooperative, Inc. v. United States,* 226 F.3d 1322, 1327 (Fed.Cir.2000). Courts are to err on the side of including employees in the system unless an exemption is beyond question. As the Supreme Court said in *United States v. Silk,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947):

The very specificity of the exemptions ... and the generality of the employment definitions indicates that the terms

'employment' and 'employee' are to be construed to accomplish the purposes of the [Social Security Act]. As the federal social security legislation is an attack on recognized evils in our national economy, a constricted interpretation of the phrasing by the courts would not comport with its purpose. Such an interpretation would only make for a continuance, to a considerable degree, of the difficulties for which the remedy was devised and would invite adroit schemes by some employers and employees to avoid the immediate burdens at the expense of the benefits sought by the legislation.

331 U.S. at 711–12, 67 S.Ct. 1463.

■ Taxpayers bear the burden of establishing a tax exemption. *Storall Manufacturing Co. v. United States,* 755 F.2d 664, 665 (8th Cir.1985). The burden to establish an exemption is a heavy one, since tax exemptions must be unambiguously proved and cannot be implied. *United States v. Wells Fargo Bank,* 485 U.S. 351, 354, 108 S.Ct. 1179, 99 L.Ed.2d 368 (1988); *Groves v. United States,* 533 F.2d 1376 (5th Cir.1976). The First Circuit has held that, "if 'doubts are nicely balanced' regarding the applicability of a tax exemption, the exemption must be accorded its more limited interpretation." *Tupper v. United States,* 134 F.3d 444, 446 (1st Cir. 1998) (citing *Trotter v. Tennessee,* 290 U.S. 354, 356, 54 S.Ct. 138, 78 L.Ed. 358 (1933)).

*B. The History of the Social Security Act's Treatment of Medical Residents*

I accept the United States' interpretation of the history of the Social Security Act and the position of the United States that medical residents have never been excluded from social security taxation.[2]

The Social Security Act was signed into law in 1935. The 1939 amendments created both the student exception and a separate exception for medical interns, as follows:

(10)(A) Service performed in any calendar quarter in the employ of any organization exempt from income tax ... if ... (iii) such service is performed by a student who is enrolled and regularly attending classes at a school, college, or university. [53 Stat. 1385, § 1426(b)(10)(A) of the Internal Revenue Code of 1939] ....

(10)(E) Service performed in any calendar quarter in the employ of a school, college, or university, not exempt from income tax under section 101, if such service is performed by a student who is enrolled and is regularly attending classes at such school, college, or university, and the remuneration for such service does not exceed $45 (exclusive of room, board, and tuition) [*Id.* at § 1426(b)(10)(E) ] ....

(13) ... [S]ervice performed as an intern in the employ of a hospital by an individual who has completed a four years' course in a medical school chartered or approved pursuant to State law. [*Id.* at § 1426(b)(13) ].[3]

53 Stat. 1385 [**DE # 47, at 11–12**].

Congress made clear that the intern exception did not apply to residents. The House Report described the intern exception as relating to "service performed as an intern *(as distinguished from a resident doctor)* in the employ of a hospital by an individual who has completed a 4 years' course in medical school chartered or approved pursuant to State law." H.R.Rep.

---

2. The United States has provided an addendum containing selected authorities and documents relevant to the issues raised in this case [**DE # 47**].

3. The parties do not dispute that an intern is a resident who is in the first year of a residency program, that is, in his or her first year after graduating from medical school.

No. 76–728 at 550–51 [**DE # 47 at 68–69**] (emphasis added).

Thus, after 1939, students working for tax-exempt organizations; students working for non-tax-exempt schools and regularly attending classes there, as long as their wages did not exceed $45 per quarter; and medical interns working for a hospital after having completed medical school; were all exempt from social security taxes under separate clauses of the tax code. Self-employed physicians were also excepted. *See, e.g.*, § 1402(c)(5) [**DE # 47 at 6, 23**].

The exclusions from coverage that were adopted in 1939 were very narrowly drafted and essentially constituted *de minimis* exceptions to the Act. Congress explained the underlying rationale behind the additional exclusions as follows:

> The intent of the amendment is to exclude those persons and those organizations in which the employment is part-time or intermittent and the total amount of earnings is only nominal, and the payment of the tax is inconsequential and a nuisance.

H.R.Rep. No. 728, 1939–2 C.B. at 543 [**DE # 47 at 61**].

In 1950, Congress eliminated the quarterly limit on remuneration paid to an employee/student of a nonexempt school, college, or university was eliminated, and combined the separate student exclusion provisions for exempt and nonexempt entities. Social Security Amendments of 1950, Pub.L. No. 81–734, § 104(a), 64 Stat. 477, 497, 531 (1950). Section 1426(b)(11)(B) of the Code then in effect provided that the term "employment" does not include:

> Service performed in the employ of a school, college, or university if such service is performed by a student who is enrolled and is regularly attending classes at such school, college, or university.

[**DE # 47 at 18**]. Identical language appears in today's 26 U.S.C. § 3121(b)(10). Congress continued to describe this exception as pertaining only to "nominal" compensation:

> The bill would continue to exclude service performed for nominal amounts in the employ of tax-exempt nonprofit organizations, service performed by student nurses and interns, and services performed by students in the employ of colleges and universities.

H.R.Rep. No. 81–1300, *reprinted in* 1950–2 C.B. 255, 260 [**DE # 47 at 73B**].

The 1965 amendments to social security expanded social security to increase the coverage of physicians. Although interns and self-employed physicians had initially been excluded from coverage in the 1930s, the 1965 amendments expanded social security to include both interns and self-employed physicians.

## C. Medical residents do not qualify for the student exception

■ Mt. Sinai contends that its residents qualify for the "student exception" from FICA coverage. But, narrowly construing the statute, as must be done, I find that the student exception, as a matter of law, does not include medical residents.

### 1. Medical Residents Have Always Been Covered By the Social Security Act

After 1939, nominal salaries or stipends received by students from their schools were exempt from FICA taxation under § 1426(b)(10)(E) of the 1939 Internal Revenue Code. [**DE # 47 at 12**]. Salaries or stipends of medical interns were separately exempted under 26 U.S.C. § 1426(b)(13) (which in 1954 became 26 U.S.C. § 3121(b)(13)) [**DE # 47 at 12**]. Self-employed physicians were also generally exempt. *See, e.g.*, § 1402(c)(5) [**DE # 47 at**

6, 23]. Consequently, from 1939 until the Social Security Amendments of 1965, medical students employed by their university, medical interns, and physicians in private practice were excepted from social security, but medical residents were not. Thus, medical residents had been exempt from FICA taxation as undergraduate students, exempt under the student exception as medical students, and exempt as interns under the intern exception, and they could expect to be exempt again when they completed their residencies and began to practice medicine full time. During their residencies, however, they were taxed.

During this period, some residents contended that it was unfair to pay social security taxes during the relatively brief time that they would be covered under the Social Security Act and argued that they were covered by the then-existing exception for medical interns. They argued that, in substance, there was no difference between a medical resident and a medical intern, and that therefore they qualified for the § 3121(b)(13) intern exception.

In *St. Luke's Hospital Assoc. v. United States*, 1 Ohio Misc. 89, 333 F.2d 157 (6th Cir.1964), the Sixth Circuit Court of Appeals rejected the residents' argument that they were exempt from the social security tax, reversing the trial court's holding that medical residents fell within the intern exception. The Sixth Circuit held that a distinction did exist between residents and interns in 1939, 333 F.2d at 160–62, and that, in creating the intern exception, Congress had explicitly distinguished interns from medical residents and had singled out only the intern for an exemption from the social security tax. In making this ruling, the Sixth Circuit quoted the legislative history of the 1939 amendments:

Paragraph (13) excepts services performed as a student nurse in the employ of a hospital or a nurses' training school by an individual who is enrolled and is regularly attending classes in such a school chartered or approved pursuant to State law; and service performed as an intern (*as distinguished from a resident doctor*) in the employ of a hospital by an individual who has completed a 4 years' course in medical school chartered or approved pursuant to State law.

333 F.2d at 163, quoting H.R.Rep. No. 76–728 at 550–51 (emphasis added). The Court recognized that the distinction between interns and residents might have blurred somewhat since 1939, and it also recognized the anomaly the medical residents had complained of in subjecting them to social security taxes only during the few years that they were residents. The Court, however, declined to allow medical residents to be excluded from social security, finding that only Congress could expand the intern exception to include medical residents. 333 F.2d at 164.

The Sixth Circuit recognized that the term resident, as it was used in 1939, was comprised of two types of doctors: regular staff physicians who were resident in a hospital, and the residents who were training to become specialists (the so-called resident-in-training). The Court also recognized that a resident-in-training had much in common with an intern, but rejected the argument that residents-in-training qualified for the intern exemption. *St. Luke's*, 333 F.2d at 163–64.[4] The Sixth Circuit found that Congress had an "obvious understanding" of the two types of physicians that were categorized as "residents" and that Congress meant to include both in social security when it specifically excluded from social security only "service performed as an intern (as distinguished from a resident doctor)." 333 F.2d at 163. The Sixth Circuit recognized the difficulty of its

---

4. The parties do not dispute that the term "resident" in 1939 included those residents

who were seeking further training in a specialized field of medicine.

decision, since there were many similarities between interns and residents in 1939, and that those similarities had only increased up to 1964. But the Court noted that its resolution was made easier in light of the principle of statutory construction that social security should be construed in favor of "coverage rather than exclusion." 333 F.2d at 164. Recognizing that there was some appeal to the residents' argument, the Court essentially invited Congress to step in and resolve the question:

> In all of the above we do not ignore the fact that distinctions between interns and residents-in-training have been substantially reduced in the years since 1939. The resident training program has been greatly expanded and its educational aspects have been greatly enhanced. *No doubt these developments lend some weight to the argument for expansion of the intern exemption to cover residents-in-training. It seems clear to us, however, that meeting these changed conditions, if indeed there is warrant for doing so at all, is a function of legislation and not that of judicial interpretation.*

*Id.* at 164 (emphasis added).

One year after the Sixth Circuit concluded that a legislative action would be helpful, Congress acted. Congress chose, however, *not* to expand the intern exception to cover residents, but eliminated the intern exception altogether, and also eliminated the exemption for self-employed physicians. Thus, after the 1965 amendments, the typical physician was covered under social security during internship, residency, and private practice. The legislative history indicates that Congress intended to expand social security coverage for physicians:

> Coverage would also be extended to services performed by medical and dental interns. The coverage of services as an intern would give young doctors an ear-

lier start in building up social security protection and would help many of them to become insured under the program at a time when they need the family survivor and disability protection it provides. This protection is important for doctors of medicine who, like members of other professions, in the early years of their practice, may not otherwise have the means to provide adequate survivorship and disability protection for themselves and their families.

H.R.Rep. No. 89–213, 89th Cong. 1st Sess. 95, 1965–2 C.B. 733, 735 **[DE # 47 at 82]**. It is noteworthy that Congress did referred to medical interns as "young doctors", and not as students. S. Rep. 89–404 **[DE # 47 at 85–86]**. Congress specifically intended to allow residents to "build[ ] up social security protection" and to provide family survivor benefits to them, if necessary. *Id.* The Senate report echoed the sentiment of the House and also emphasized that interns "would be covered on the same basis as other employees working for the same employers." S.Rep. No. 89–404 **[DE # 47 at 85–86]**. In other words, the clear intent of Congress was to expand social security coverage to include these young doctors during their post-medical school training.

At the same time, Congress repealed the exception for self-employed doctors previously found in 26 U.S.C. § 1402(c)(5). Social Security Amendments of 1965, § 311(b)(1), 79 Stat. 381. The House Report explained the repeal as follows:

> Self-employed doctors of medicine are the only group of significant size whose self-employment income is excluded from coverage under social security. Large numbers of doctors have requested coverage. Your committee knows of no valid reason why this single professional group should continue to be excluded. *It runs counter to the general view that coverage should be as universal as possible.*

H.R.Rep. No. 89–213, 1965–2 C.B. at 734–35 [DE # 47 at 81–82] (emphasis added).

Thus, in 1965 Congress brought medical interns and self-employed medical practitioners within the ambit of Social Security coverage. Medical residents had always been covered by Social Security. Congress gave no indication that, in expanding social security to include interns and private physicians within the scope of coverage, Congress somehow intended to exclude medical residents and interns from coverage as students in light of the then-recent decision in St. Luke's.

Therefore, I find that interpreting the student exception to include medical residents would conflict with the clear intent of Congress to reserve the student exception for students working few hours and earning nominal compensation, and with the stated intent of Congress to have young doctors, specifically including interns, covered by social security. The legislative actions discussed above, taken together, reflect a broad plan by Congress to cover medical doctors under the social security system, regardless of whether they are still in training or not.

I further find that the focus of an intern's and a resident's service was educational in 1939, remained educational in 1965, and remains educational today. The parties do not dispute that the purpose of a medical residency is to train young doctors. However, nothing suggests that in 1965, Congress was unaware of the educational components of an internship or residency, and, when eliminating the intern exception in 1965, Congress made no mention of the possibility that interns and residents could qualify for the student exception. Even in the St. Luke's case, St. Luke's Hospital did not argue that its residents were entitled to exemption from FICA taxation under the student exception, even though the hospital presented evidence of the educational component of a residency. Thus, despite the educational function of an internship and residency, Congress plainly intended that social security cover "young doctors", like "other employees working for the same" hospital [DE # 47 at 82, 85–86].[5]

In the present case, the relevant statute excludes from the term "employment," services rendered for a "school, college, or university" by "a student who is enrolled and regularly attending classes at such school, college, or university." 26 U.S.C. § 3121(b)(10).[6] With the 1939 amendments, Congress simultaneously enacted

---

**5.** While it is not essential to the ruling on this case, I note that the residents at issue in this case were treated similarly to other employees of Mt. Sinai, in that they were covered by the same Mt. Sinai medical malpractice insurance policy that covered other physicians employed by Mt. Sinai as well as nurses and physician assistants employed by Mt. Sinai and were covered under Florida's Workers' Compensation law. Also Mt. Sinai provided residents with life insurance and disability insurance, both free of charge, while other physician employees of Mt. Sinai had to contribute toward their life insurance coverage and their disability insurance coverage. Finally, during the time period at issue, residents were allowed to participate in the Mt. Sinai retirement plan, without receiving matching contributions from Mt. Sinai, unlike other Mt. Sinai employees, who received matching contributions from Mt. Sinai. It appears somewhat disingenuous for Mt. Sinai to argue that it allowed its residents to participate in Mt. Sinai's own retirement system, but that the residents were students who were not covered by the Social Security system.

**6.** The Treasury has issued a regulation interpreting § 3121(b)(10) which does not directly answer the question in this case. See Treas. Reg. § 3121(b)(10)–2 [DE # 47 at 30]. However, a new regulation has taken effect, for services performed on or after April 1, 2005, which reaffirms the Treasury's longstanding interpretation of § 3121(b)(10) that workers such as medical residents cannot qualify for the student exception. See 69 Fed.Reg. 76404 (effective date, Dec. 21, 2004). This regula-

the intern and the student exception. If Congress had considered interns as falling within the student exception, there would have been no need for a separate intern exception.

I also reject Mt. Sinai's argument that Congress repealed the intern exception because it "was no longer necessary" since the service-oriented intern of 1939 no longer existed, and that in 1965 Congress intended that residents and interns could seek exclusion from the FICA taxation pursuant to the general, broad student exemption [DE # 61 at 9]. I find that in the 1965 amendments, Congress intended that all medical residents and interns be covered by Social Security, and that if Congress had then believed that residents qualified for the student exception, Congress would have mentioned that the intern exception was being repealed because interns and medical residents could qualify for the student exception. In 1965, the idea that medical residents might qualify as students was a concept contrary to the then-recent decision in *St. Luke's* that had held that medical residents had always been subject to the social security tax. If Congress had intended to include residents and interns within the student exception, Congress would likely have stated that it was overruling *St. Luke's*.

I find that the intent of Congress was that social security coverage would be extended to services performed by medical and dental interns, because coverage was important for doctors of medicine who, like members of other professions, in the early years of their practice, may not otherwise have the means to provide adequate survivorship and disability protection for themselves and their families. [DE # 47 at 82]. This is even more true today, where doctors may spend four years in college and then four years in medical school, without being covered by social

security, and then up to seven years as a medical resident.

2. Mount Sinai's Position Violates The Rules of Statutory Construction.

 In general, "the words of statutes—including revenue acts—should be interpreted where possible in their ordinary, everyday senses." *Malat v. Riddell,* 383 U.S. 569, 571, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966). But "[t]he true meaning of a single section of a statute in a setting as complex as that of the revenue acts, however precise its language, cannot be ascertained if it be considered apart from related sections, or if the mind be isolated from the history of the income tax legislation of which it is an integral part." *Commissioner v. Engle,* 464 U.S. 206, 223, 104 S.Ct. 597, 78 L.Ed.2d 420 (1984). Moreover, legislation must not be read so as to render any part of it superfluous. *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955); *Gonzalez v. McNary,* 980 F.2d 1418, 1420 (11th Cir.1993). Mt. Sinai agrees that the statutory provisions should not be interpreted in any manner that thwarts the purpose of the lawmakers. [DE # 61 at 6].

Thus, today's student exception—which still exists in much the same form as originally enacted in 1939—cannot encompass medical interns, because it would have rendered superfluous the original intern exception language. *See United States v. Menasche,* 348 U.S. at 538–39, 75 S.Ct. 513. In 1939, Congress expressed its intent that the intern exception *not* include "resident doctor[s]," lending further support to the notion that the student exception included neither medical interns or medical residents. *See* H.R.Rep. No. 76–728 at 550 (1939) [DE # 47 at 68] (excluding "service performed as an intern (as distinguished from a resident doctor)").

tion is not applicable to the time period at issue in this case.

As previously discussed, statutes granting exemptions from social security must be narrowly construed, and exemptions cannot be implied. *United States v. Wells Fargo Bank,* 485 U.S. 351, 108 S.Ct. 1179, 99 L.Ed.2d 368 (1988). Interpreting the student exception to include medical residents would violate the rule that no statute should be read in such a way as to make any of its provisions superfluous and the rule that exemptions must be narrowly construed.

### 3. I Decline To Follow the Authority Relied On By Mt. Sinai

In support of its position that the student exception from FICA taxation can cover medical residents, Mt. Sinai relies on *Minnesota v. Apfel,* 151 F.3d 742 (8th Cir. 1998) and *United States v. Mayo Foundation,* 282 F.Supp.2d 997 (D.Minn.2003). I find *Minnesota v. Apfel* factually distinguishable from the instant case. I further find that the *Mayo Foundation* case, insofar as it held that medical residents could be excluded from FICA taxation under the student exception, 282 F.Supp.2d at 1005–07, was incorrectly decided, and I do not follow it.

*Minnesota v. Apfel* involved the issue of whether medical residents at the University of Minnesota Medical Center were excluded from FICA taxation as employees of the State of Minnesota who were not included in a 1955 agreement between Minnesota and the Social Security Administration, made pursuant to 42 U.S.C. § 418, concerning which state employees would be subject to social security. Therefore, the state never made social security contributions for medical residents employed at the University of Minnesota. However, in 1990, the Social Security Administration determined that medical residents employed at the University of Minnesota should be included in social security. 151 F.3d at 744. The state contested that determination, arguing primarily that its medical residents were not part of the § 418 agreement and that they never were intended to be covered pursuant to the agreement. *Id.* at 744–45. The Eighth Circuit affirmed the district court's finding that the 1955 agreement was not intended to cover medical residents employed by the State of Minnesota. *Id.* at 744. The Court went on to reject the government's argument that subsequent legislation made the parties' intent in 1955 irrelevant, and held that, as a matter of contract law, medical residents were not included in the § 418 agreement as employees of the university. *Id.* at 745–47. I find to be *dictum* and unnecessary to the resolution of the case the Eighth Circuit's alternative holding that, if the University of Minnesota medical residents were covered by the § 418 agreement, a student exception included within the § 418 agreement took the medical residents out of coverage. *Id.* at 747–49.

I also find unworkable the approach favored by the district court in *Mayo,* to determine whether the student exemption applies by making a case-by-case examination of the facts of each particular residency program at each particular hospital or other organization employing medical residents. 282 F.Supp.2d at 1007. It is undisputed that since *Apfel* was decided, more than 7,000 claims have been filed with the IRS seeking refunds of over $1.135 billion of social security taxes paid by residents and hospitals, based on an argument that medical residents are excepted from social security coverage. Each of these factual situations could require a separate trial. It is difficult to imagine that Congress intended to create the result. As the former Fifth Circuit stated in a similar situation in *Parr v. United States,* 469 F.2d 1156, 1159 (5th Cir.1972), "[T]hese facts, or facts nearly identical, have been litigated so often that one may wonder whether this

is wise or what good it can do." Thus, I find that, as a matter of law, medical residents are covered by social security.[7]

## V. Conclusion

Viewing the facts in the light most favorable to Defendant Mount Sinai Medical Center of Florida, as I am required to do at this summary judgment stage, I find that there is no genuine disputed issue of material fact as to whether medical residents may be considered students who are exempt from FICA taxation. I find that, as a matter of law, medical residents are not students who are exempt from FICA taxation.

It is hereby **ORDERED AND ADJUDGED** that Plaintiff United States of America's Motion for Summary Judgment [DE # 46] is **GRANTED**.

---

**7.** While Mt. Sinai initially asserted that the stipends paid to its medical residents were qualified scholarships pursuant to 26 U.S.C. § 117, Mt. Sinai no longer claims an exemption to FICA taxation pursuant to 26 U.S.C. § 117. (Mt. Sinai's Response To Plaintiff's Statement of Material Facts, **DE # 62** at ¶ 5). Therefore, I find that the stipends paid Mt. Sinai's medical residents are not qualified scholarships exempt from FICA taxation pursuant to 26 U.S.C. § 117, and I enter summary judgment for the United States on that issue.