RICHARD B. ZONDERMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Zonderman v. Commissioner
Docket No. 3402-75
United States Tax Court
T.C. Memo 1977-2; 1977 Tax Ct. Memo LEXIS 437; 36 T.C.M. (CCH) 6; T.C.M. (RIA) 770002; January 11, 1977, Filed *437 Petitioner was a Ph.D. candidate in clinical psychology.In order to fulfill one of the degree requirements he participated in a pre-doctoral internship program in clinical psychology. In connection with the program petitioner was paid a stipend by the hospital. Held, the stipend does not qualify as a fellowship within the meaning of sec. 117. Matthew N. Ott, Jr., for the petitioner. John C. McDougal, for the respondent. STERRETT
MEMORANDUM OPINION STERRETT, Judge: Respondent determined a deficiency in petitioner's Federal income tax for the calendar year 1973 in the amount of $817. The sole issue for decision is whether amounts received by petitioner in his capacity as a psychology intern qualify as a scholarship or fellowship within the meaning of section 117, I.R.C. 1954. All of the *438 facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner Richard B. Zonderman, hereinafter petitioner, resided in Richmond, Virginia at the time he filed his petition herein. Petitioner timely filed his Federal income tax return for the calendar year 1973 with the district director of internal revenue, Richmond, Virginia. In September 1971, petitioner began a Ph.D. program in clinical psychology at Virginia Commonwealth University, Richmond, Virginia (hereinafter VCU). In order to obtain a Ph.D. in clinical psychology, each student was required: (1) to complete 72 hours of course work, and (2) to participate in a full calendar year pre-doctoral internship in clinical psychology at an approved internship away from the campus of VCU. This internship is a standard requirement for any student seeking a Ph.D. in clinical psychology at VCU. To satisfy the latter requirement, petitioner applied to a number of agencies which provide the requisite internship program and was accepted by Central Louisiana State Hospital, Pineville, Louisiana (hereinafter the hospital). *439 The hospital is part of the Louisiana State Hospital system, and the internship program for clinical psychology graduate students was approved by the American Psychological Association. The primary function of the hospital was treatment. However, in addition to the approved internship in clinical psychology, the hospital had training programs for other disciplines, to wit dance therapy, music therapy, various programs for bachelor degree level candidates, and a training program for Louisiania State University psychology majors. Accordingly, training people in fields relating to mental health was one of the hospital's important functions. The hospital's pre-doctoral internship program in clinical psychology is an American Psychological Association approved training program for graduate students working toward a doctorate in clinical psychology. The avowed purpose of the program is contained in a brochure published by the hospital which is set forth, in pertinent part, below. The Hospital is vitally concerned with the training of future professionals for the mental health field. It cooperates with universities both in Louisiana and outside the State in offering training *440 positions for undergraduate psychology majors and clinical practicums for masters-level students. In addition the Hospital offers a comprehensive one-year internship in clinical psychology, which is approved by the American Psychological Association. The clinical psychology internship at Central Louisiana State Hospital was designed to offer the intern a wide variety of experiences in the theoretical and applied aspects of clinical psychology. The intern not only increases his skills as a clinician but also becomes more oriented to the broader professional qualities expected of a clinical psychologist. The individual intern receives training designed to give him experience in as many types of clinical situations as possible. His training involves contact with patients including both males and females, adults, adolescents and children, different racial and cultural groups, and inpatients and outpatients. Diagnostic categories of these patients encompass the entire range of neuropsychiatric disorders including: mental retardation, brain damage, behavior disorders, and the various classical neuroses and psychoses. Although the program is fairly well structured, it is also flexible *441 to allow for individual needs and, to some extent, the preferences of the intern. The philosophy of the training program is that the Hospital should endeavor to offer experiences which the clinical training committee and major professor of the intern feel would be most valuable. After an intern has been accepted into the training program, correspondence is undertaken with his university to correlate the training experience between the two institutions in order to maximize training potential. During his year of training the intern works with experienced professionals as well as trainees from other disciplines. He is associated with professional and trainee-level Psychiatrists, Social Workers, Chaplains, Music Therapists, Medical Librarians, Vocational Rehabilitation Counselors, Special Education Teachers, and Psychiatric Nurses. The intern will work at different times in close conjunction with members from these various disciplines in order to gain a greater appreciation for their work and to learn how Psychologists can cooperate with them in order to enhance the services of the respective disciplines. The intern receives individual supervision for approximately 6 hours each *442 week. He is supervised in various clinical areas, such as diagnostic testing and personality evaluation, individual and group psychotherapy, family and multiple-family therapy, psychodrama, behavior modification techniques, research, teaching, and community mental health. Training staffs provide the intern an opportunity to present his psychological evaluations before the personnel of the entire Hospital. Periodically the intern will be assigned specific areas, current clinical topics or research reports in psychology for review and presentation to the weekly psychology staff seminars. The intern will also be given specific reading assignments which he will be expected to complete on his own time. During the last quarter of his training, the intern, with approval of the Research Committee of the Hospital, may elect to do a research project under supervision. This study may or may not be related to his dissertation. Also, toward the end of the internship, if the intern has demonstrated his competence, he will gain supervised experience in consulting and supervisory skills. * * *
Staff members throughout the Hospital participate in the training of the intern. However, *443 within the Psychology Department itself, staff members have specified duties related to training. Areas of interest and theoretical orientations of these staff members vary considerably. Behavioral modification, cognitive, community, and eclectic points of view are represented. Under the internship program each intern received approximately 10 hours per week of didactic or instructional experiences, including 5 to 6 hours per week of formal supervision time. Supervision varied from "curbstone" to didactic, was tailored to individual needs, and generally shifted from structured to informal and collaborative over the course of the year. In addition to clinical supervision, a brief seminar series was offered. The series was offered by both psychologists and other professional at the hospital, and included such topics as hypnosis, organic disorders, grantsmanship, forensic psychology, psychotropic drugs, and phenomenology of psychosis. From September 1972 to August 1973, petitioner participated in the hospital's internship program. He was listed on the hospital's payroll as a psychologist. He was a temporary employee and received no fringe benefits normally allowed to permanent *444 employees, such as sick leave, vacation days, credit union membership, or participation in the retirement program. None of the opportunities for promotion or increases in compensation accorded permanent hospital employees was available to petitioner under the internship program. Although petitioner was expected to work approximately 40 hours per week, the amount of money he received was not contingent upon the number of hours worked. Nor was his stipend determined by reference to his financial need. [1]
Petitioner did not replace a permanent staff psychologist although he did perform services that, in his absence, would have to have been performed by permanent staff members. There was no requirement, expressed or implied, that petitioner, as an intern, would be obligated to work for the hospital after he received his degree. Petitioner did not do any personal or individual research during his internship although other interns did some work on dissertations. The following is a description of the experience and supervision provided *445 petitioner: 1. All patients entering were interviewed by the admissions unit to aid disposition planning. Initially, petitioner observed a staff psychologist conduct these interviews, then conducted them under the staff psychologist's supervision. Eventually, petitioner was allowed to conduct these interviews alone. His reports were approved at staffings by the staff psychologist and psychiatrist on the admissions unit. 2. Psychodiagnostic testing was infrequent and usually consisted of the administration of an intelligence test. Reports were reviewed by the chief psychologist before being included in the patient's chart. 3. Petitioner received supervision in individual therapy, group therapy, family therapy, and marriage counseling with a variety of adult and adolescent psychiatric disorders. Direct supervision for individual therapy was provided by a co-therapist, and indirect supervision was provided by the head of the unit through which the therapy was conducted. Similarly, family therapy supervision was provided both directly and indirectly. Group therapy and marriage counseling supervision was provided directly by the psychologist in charge of group therapy at *446 the hospital with whom petitioner conducted groups and saw couples. In addition to the supervision provided by the staff psychologists on the various units through which therapy was conducted, general supervision and a coordination of petitioner's training experience were provided in weekly meetings with the chief psychologist. All staff psychologists reported weekly to the chief psychologist on petitioner's progress. 4. In addition to the specific skills described above, a more general experience in the functioning of clinical psychologists within a clinical setting was provided by a rotation throughout the various sections of the hospital. An office was provided petitioner on the various units on which he worked during his internship, thereby providing him with exposure to the ways the units operated. Again, explanations and supervision were provided by the unit head. Petitioner spent time on the admissions unit, the adolescent unit, the acute treatment unit, the alcoholic treatment unit, an inner hospital unit (continued service unit), and saw patients on several other units. Petitioner was free to change units according to his training needs. 5. Petitioner attended *447 seminars, weekly psychology department meetings, lectures, and local psychology association meetings. During the period of his internship, the hospital paid petitioner $8,280. Of this amount, $5,024.63 was paid to petitioner during the taxable year 1973. From the amount paid in 1973, the hospital withheld $869.93 in federal income tax. The amount of petitioner's stipend for the year was determined prior to his arrival at the hospital. The stipend was on a fixed yearly basis and was payable twice monthly. Petitioner, on his 1973 return, excluded the $5,024.63 from gross income and respondent determined such exclusion to be erroneous. Section 117[2] excludes from gross income any amount received by an individual as a scholarship or a fellowship grant. While these terms are not defined in the governing statute, section 1.117-3(c) defines a fellowship grant as an amount "paid or allowed to or for the benefit of, an individual to aid him in the pursuit of study or research." Section 1.117-3(a) defines scholarship in a similar manner. It is also well settled that these terms do not embrace payments which either represent compensation for services or enable the individual to *448 pursue studies primarily for the benefit of the grantor. Section 1.117-4(c), Income Tax Regs.[3] In Bingler v. Johnson,394 U.S. 741, 751 (1969), the Supreme Court, in upholding the validity of section 1.117-4(c), described the characteristics of a scholarship or a fellowship grant as follows: Here, the definitions supplied by the Regulation clearly are prima facie proper, comporting as they do with the ordinary understanding of "scholarships" and "fellowships" as relatively disinterested, "no-strings" educational grants, with no requirement of any substantial quidproquo from the recipients. Thus, the regulations and case law draw a dichotomy between a scholarship or fellowship on the one hand and compensation on the other. *449 Interns and residents have been flooding the courts for years seeking to have their remuneration declared a "fellowship grant" and hence partially excludable from income. They have advanced such illuminating arguments as they could have earned more elsewhere and they were enjoying a learning experience so therefore what they did receive must have been a grant. They have been almost universally unsuccessful and deservedly so. Why the amounts received by a young doctor just out of school should be treated differently from the amounts received by a young lawyer, engineer, or business school graduate has never been made clear. The purpose of the hospital in making the grant is critical and is a question of fact the answer to which must be gleaned from an examination of the entire record. Of particular import are the activities carried on by petitioner. George L. Bailey,60 T.C. 447 (1973). In the present case the record leaves no room for doubt that the internship program in which petitioner participated was established for the purpose of training the participants therein. However, such fact in and of itself is not determinative. Aloysius J. Proskey,51 T.C. 918 (1969). *450 To our mind it is obvious that petitioner performed substantial services for the hospital. Compare William Wells,40 T.C. 40 (1963). It is apparent that a large portion of petitioner's time at the hospital was devoted to working with staff members to further the care of patients. Admittedly, such services were supervised and/or reviewed by permanent staff members. However, we cannot agree with petitioner that his activities did not result in either lessening the workload of the hospital staff or enabling the hospital to provide better patient care. Moreover, the record indicates that petitioner was required to be at the hospital approximately 40 hours per week. Such requirement when coupled with the high rate of payment to petitioner and the fact that the stipend was not based upon petitioner's financial need indicates to us that the stipend at issue bore many of the characteristics of compensation. In David M. Brubakken, 67 T.C. (Nov. 18, 1976), we held that an amount received by a taxpayer, who was also a participant in an A.P.A. approved internship program in order to fulfill the requirement of Washington State University for a Ph.D. degree, was *451 not excludable from income under section 117. The duties performed by the taxpayer therein and petitioner are comparable in all material respects. Although there are some differences in the facts of Brubakken and the instant case we find them to be insufficient to justify a result different than that reached in Brubakken.
Decision will be entered for the Respondent. Footnotes
1. All interns received the same stipend. Petitioner occasionally worked more than 40 hours in a week but was not paid for the extra time.↩
2. SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS. (a) General Rule.--In the case of an individual, gross income does not include-- (1) any amount received-- (A) as a scholarship at an educational institution (as defined in section 151(e)(4)), or (B) as a fellowship grant, including the value of contributed services and accommodations; and * * *. ↩
3. Sec. 1.117-4(c). Amounts paid as compensation for services or primarily for the benefit of the grantor. (1) Except as provided in paragraph (a) of sec. 1.117-2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor. (2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor. However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117↩ if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. Neither the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself, be considered to destroy the essential character or such amount as a scholarship or fellowship grant.