**UNITED STATES of America,**
**Plaintiff,**

v.

**PARTNERS HEALTHCARE SYSTEM,**
**INC., Defendant.**

**Civil Action No. 05–11576–DPW.**

United States District Court,
D. Massachusetts.

Sept. 30, 2008.

Elizabeth L. Davis, Stephen T. Lyons, U.S. Department of Justice, Tax Division, Washington, DC, for Plaintiff.

Christopher Kliefoth, Mark H. Churchill, McDermott, Will & Emery LLP, Washington, DC, Edward P. Leibensperger, Joseph H. Selby, McDermott, Will & Emery, Boston, MA, Thomas D. Sykes, McDermott Will & Emery LLP, Chicago, IL, for Defendant.

*MEMORANDUM AND ORDER*

DOUGLAS P. WOODLOCK, District Judge.

The United States commenced this action against Partners Healthcare System, Inc. ("Partners") to recover approximately $24.2 million paid as a refund for taxes originally collected under the Federal Insurance Contributions Act ("FICA") on payments made to medical residents in calendar years 2001, 2002, and 2003. This motion for summary judgment presents two questions: (1) whether the payments received by the residents were "wages" subject to FICA taxes under 26 U.S.C. § 3121(a) and, if so, (2) whether they fell under the "student exception" of 26 U.S.C. § 3121(b)(10). While I find the first question may be answered "YES" on this limited summary judgment record, given the austere and demanding approach to summary judgment developed recently in the courts regarding the second question, an answer must be deferred until after trial.

## I. BACKGROUND

The following facts are presented in the light most favorable to Partners.[1]

### A. Partners

Partners was formed in 1994 by Massachusetts General Hospital ("MGH") and Brigham and Women's Hospital ("BWH"). Pl.Ex. 1. The organization, which originally included MGH, BWH, and their affiliated hospitals, now includes North Shore Medical Center, Faulkner Hospital, Newton–Wellesley Hospital, Spaulding Rehabilita-

tion Hospital, Youville Hospital and Rehabilitation Center, Partners Community HealthCare, Inc., Dana–Farber/Partners CancerCare, and Partners Home Care. *Id.*

Partners is a Massachusetts nonprofit organization exempt from tax under § 501(c)(3) of the Internal Revenue Code. Def. Statement of Facts, Ex. B. Its purpose, as stated in its application for § 501(c)(3) status, is "to organize, operate and support the comprehensive health care systems" of its member hospitals. Pl.Ex. 2. at PHS000185. To that end, its primary function is "to coordinate and to provide strategic planning opportunities" so that its member hospitals can more efficiently deliver high-quality patient care, medical education, and research. *Id.* at PHS000188.

Partners has a mission consisting of three functions: patient care, medical education, and medical research. Thiboult Decl. ¶ 3; Weinstein Decl. ¶ 4. With respect to education, Partners is a major teaching affiliate of Harvard Medical School, and most of the attending physician staff at MGH and BWH hold Harvard Medical School faculty appointments. Weinstein Decl. ¶ 4. Partners also coordinates the residency and fellowship programs of its member hospitals under its Graduate Medical Education ("GME") division. Pl.Ex. 5; Thibault Decl. ¶ 6. GME training programs, sponsored primarily by MGH and BWH, include approximately 100 residencies and fellowships that are accredited by the Accreditation Council for Graduate Medical Education ("ACGME").[2] Pl.Ex. 5; Weinstein Decl. ¶¶ 3, 5.

---

1. Claiming that this case involves only questions of law that require little factual background, the United States reserved the right to contest Partners' factual allegations, but provided few factual allegations of its own. *See* Pl. Reply at 4. As a result, this background section draws primarily from Partners' submissions.

2. The ACGME is a voluntary association formed by five member organizations: the American Board of Medical Specialities, the American Hospital Association, the American Medical Association, the Association of American Medical Colleges, and the Council of Medical Speciality Societies. Weinstein Decl. ¶ 14. The ACGME promulgates requirements

## B. Residents

Interns, residents, and fellows are medical school graduates who are undergoing training in a specialty or subspecialty. Pl. Ex. 6 at 3. The primary goal of this training is the development of practical skills. Weinstein Decl. ¶ 7. Interns are typically residents in their first year of training out of medical school. *Id.* ¶ 11. Residency programs extend from a minimum of three years to a maximum of eight years, depending on the specialty. *Id.* The term "fellow" refers to a physician who has completed a residency program and is pursuing advanced training in a subspecialty. Pl.Ex. 6 at 3. Fellowship programs generally require an additional one to three years of training. Weinstein Decl. ¶ 11.

Most states, including Massachusetts, require a medical school graduate to complete at least one year of an accredited residency program before it will grant a physician's license. *Id.* ¶ 10. It is unlikely, however, that a physician could establish a practice without completing a residency program.[3] *Id.* Upon completion of a residency, physicians receive a certificate and become eligible for board certification. *Id.* ¶¶ 7, 11.

Each Partners GME program tailors the resident selection process to meet its particular needs, but they follow the same general model. Churchill Decl. Ex. 1 at 8. Applicants who have graduated from an accredited or recognized foreign medical school submit applications, including letters of recommendation and transcripts,

directly to their department of interest. *Id.* Recruitment committees in each department review the applications and select candidates to interview. *Id.* Typically, an organized matching program then matches residents with programs.

Once accepted to a Partners residency program, physicians sign an engagement contract. Pl.Ex. 7. The contract details the respective responsibilities of the resident and Partners. Residents have a number of responsibilities:

provide patient care, under appropriate supervision, as assigned by the training program director or his/her designed, consistent with the educational goals of the program and the highest standards of patient care ("patient care" includes responsibility for associated documentation in the medical record, which should be completed in a timely fashion, and attendance at patient care rounds as assigned)

make appropriate use of the available supervisory and support systems, seeking advice and input from the attending staff physician/s when and as appropriate, and in accordance with the Hospital Guidelines for Supervision of Residents and Clinical Fellows

participate fully in the educational and scholarly activities of the training program as specified by the training program director, including attendance at didactic conferences and other responsibilities which may include a research project, completion of examinations,

---

for residency training programs, and provides accreditation for those programs that are in substantial compliance with its standards. *Id.* ¶ 15. All accredited programs are required to ensure that residents have the opportunity to participate in appropriate levels of supervised patient care as well as fully to participate in academic activities. *Id.* ¶ 16.

Accreditation is required for federal reimbursement and, in many cases, for board eli-

gibility of program graduates. *Id.* Accredited programs undergo regular internal and external review to ensure compliance. *Id.* ¶ 15.

3. An increasing number of private payors will only pay for services rendered by a physician who has completed a residency. Belknap Decl. ¶ 10.

maintenance of procedure logs or other items

develop a personal program of learning to foster continued professional growth, with guidance from the teaching staff

assume responsibility, as called upon, in teaching more junior trainees and medical students, within the scope of the training program

participate in improving the quality of education provided by the training program, in part by submitting at least annually confidential written evaluations of the faculty, the program and the overall educational experience

adhere to established practices, procedures and policies of the Hospital, the Hospital's Medical/Professional Staff, the Department and affiliated training sites

participate in institutional programs, councils or committees and other medical staff activities, as appropriate

abide by the institutional and program-specific Resident Duty Hours Policies and, as scheduled by the program director, accurately report his/her duty hours

comply with institutional requirements for annual health and safety training, vaccinations and TB testing.

*Id.* at 1. Additionally, residents must satisfy licensing requirements, ACGME re-quirements, and any other requirements specific to their program. *Id.* at 2.

For its part, Partners or the hospital provides "a suitable academic environment," a training program that meets ACGME standards, and documentation of residency completion. *Id.* It also provides "Compensation and Benefits." *Id.* Residents receive an "annual salary" that varies depending on the number of years of training the resident has completed.[4] *Id.*; Churchill Decl. Ex. 1 at 5–6. Each resident receives an IRS Form W–2, Wage and Tax Statement, detailing the amount paid to the resident during the period at issue. Pl.Ex. 6 at 6.

Benefits include health, life, and disability insurance, confidential professional assistance and counseling, job-related health services, tax-advantaged retirement savings accounts, and malpractice insurance of $5 million per claim and $10 million annual aggregate per physician.[5] Pl.Ex. 7 at 2, 7. Departments may also provide residents with on-call rooms, uniforms, laundry service, meals, pagers, email access, and parking. *Id.* at 2. Residents are entitled to a minimum of ten vacation days, twelve sick days, and family or personal medical leave of up to twelve weeks. *Id.* at 9–10. Residents pay no tuition to participate in a residency program and they are not required to register for any credit

---

**4.** For the 2005–2006 academic year, first-year residents received $47,000 annually, increasing to $61,507 by the seventh year of residency. Pl.Ex. 8. The exact amount is computed by using regional market data complied by the Association of Medical Colleges ("AAMC") adjusted to accommodate Partners' budget. Churchill Decl. Ex. 1 at 6. These salaries are lower than a physician can be expected to earn after completing a residency. Thibault Decl. ¶ 11.

Claiming that the labels used in its internal documents are irrelevant, Partners argues that its residents do not receive "salaries";

they receive "stipends." Def. Statement of Facts at 3. However, since Partners labeled its payments to residents "salaries" in its prelitigation internal documents, I will use that term to refer to those payments.

**5.** Resident benefits are described in literature entitled "Benefits For Residents." *See* Churchill Decl. Exs. 2–6. These benefits differ from those offered to corporate employees and attending physicians with respect to tax-sheltered annuities, pension plans, family and medical leave, and vacation time. *Id.* Ex. 7.

hours in connection with the program. Pl. Ex. 6 at 4.

Supervised direct involvement in patient care is "essential" to the training experience of Partners residents. Thibault Decl. ¶ 9. The Chairman of the Department of Surgery at MGH explained, "You can read and study for years about how to ride the bike, but the only way you can really learn to ride one is to get on the bike and do it." Warshaw Decl. ¶ 9. Residents are actively supervised by attending physicians, with the degree of supervision depending on the competence of the individual resident. Ausiello Decl. ¶ 17. Residents have no hospital privileges or authority to admit or discharge hospital patients, but they may perform procedures and provide treatment when an attending physician is not physically present. *Id.* at ¶¶ 25–26. Ultimately, however, an attending physician is responsible for the care of the patient, and in surgical programs, must be present for the critical portion of any surgery. Warshaw Decl.¶ 6.

Partners also provides academic learning opportunities for residents, such as conferences, seminars, and research projects. Thibault Decl. ¶ 9. Resident attendance at rounds and many of the lectures and conferences is mandatory. Warshaw Decl. ¶ 13. Residents have required reading from textbooks and medical literature on an ongoing basis. *Id.*

Partners' residents undergo regular testing and evaluation, in accordance with ACGME standards and departmental requirements, to ensure that they are progressing adequately. Weinstein Decl. ¶ 26. If residents fail to demonstrate an understanding appropriate for their level of training, remedial action may be taken, including additional reading, supervision, practical experience, or even repeating a rotation or year of training. Warshaw Decl. ¶ 21–22. Rarely, but on occasion, a resident is asked to leave the program. *Id.* ¶ 11.

## C. Federal Financing

Medicare is the primary source of funding for Partners' residency program. Churchill Decl. Ex. 1 at 3. Medicare funds medical education programs through Direct Medical–Education ("DME") payments and Indirect Medical–Education ("IDE") adjustments. Adams Decl. ¶ 3. DME payments compensate hospitals for resident and faculty salaries, administrative expenses, and overhead. *Id.* ¶ 4. IDE payments offset the costs of additional tests and inefficiencies associated with attending physicians' teaching responsibilities, including slower procedures and duplicated work. *Id.* ¶ 7.

The federal government and Partners' member hospitals have standards for billing of services provided by residents. Before making a payment, Medicare requires that the hospital provide documentation showing that the resident was supervised by an attending physician and that the attending himself or herself interacted directly with the patient. Belknap Decl. ¶ 3. For non-surgical care, MGH will not generate a bill unless an attending physician physically sees the patient. Belknap Decl. ¶ 5. For a surgical bill to issue, the attending must have been present for the critical parts of the surgery and immediately available at all other times. *Id.*

## D. FICA

Prior to November 2003, Partners had treated resident salaries as wages subject to FICA taxes. The current controversy arose when Partners submitted IRS Form 941c on November 12, 2003, and May 10, 2004, excluding FICA taxes on resident salaries for the calendar years 2001, 2002, and 2003 on the grounds that the salaries were "scholarship grants for training" ex-

empt from FICA taxes. The Internal Revenue Service ("IRS") allowed the claims and in March 2004, and September 2004, credited Partners a total of $24,220,308.49 against Partners' other FICA liabilities. The IRS now claims that the credit was erroneous and brought this suit to recover the credited amount plus interest.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Once the moving party shows that there is no genuine issue of material fact, the nonmovant must produce evidence to show that such a dispute exists. *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 66 (1st Cir. 2004). A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law." *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir.2000). A "genuine" issue is one supported by such evidence that " 'a reasonable jury, drawing favorable inferences,' could resolve it in favor of the moving party." *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir.1999) (quoting *Smith v. F.W. Morse & Co., Inc.*, 76 F.3d 413, 428 (1st Cir.1996)).

In ruling on the motion for summary judgment, a court must view "the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Pacific Ins. Co., Ltd. v. Eaton Vance Mgmt.*, 369 F.3d 584, 588 (1st Cir.2004). "[C]onclusory allegations, improbable inferences, and unsupported speculation" will not be considered. *Vé-*

*lez–Rivera v. Agosto–Alicea,* 437 F.3d 145, 154 (1st Cir.2006).

## III. DISCUSSION

In order to support the Social Security system, § 3101(a) of the Internal Revenue Code imposes FICA taxes on "wages" received by an individual "with respect to employment." 26 U.S.C. § 3101(a); *see Flemming v. Nestor,* 363 U.S. 603, 609, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). The issues here are (1) whether salaries paid to residents are "wages" and (2) whether the services performed by residents fall under the student exception to the definition of "employment."

### A. Wages

Partners argues that its residents' salaries are not "wages" under 26 U.S.C. § 3121(a) because, similar to a scholarship or fellowship, the payments are intended not as compensation, but as stipends to defray the costs of living while residents pursue their courses of study. The United States contends that the payments are subject to FICA taxes because even though residents are physicians in training, their salaries represent payment for the patient care services that they perform.

Section 3121(a) defines "wages" as "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash." Subsection (a) then goes on to enumerate twenty-one exceptions. § 3121(a)(1)-(23). Partners argues that there is no need to turn to the individual wage exceptions under § 3121(a)(1)-(23) because the payments received by the residents are not wages under the operative language of § 3121(a). This argument is contrary to the language and structure of § 3121(a). The use of the modifier "all" and the specificity of the enumerated ex-

ceptions suggest that unless the payment falls within an exception, it is "wages" and subject to FICA taxes. *See* § 3121(a). The Partners' argument also runs counter to the guidance provided by the Supreme Court in this area. *See Social Security Board v. Nierotko,* 327 U.S. 358, 365, 66 S.Ct. 637, 90 L.Ed. 718 (1946) (holding that the definitions of "wages" and "employment," when read "with the purpose of the Social Security Act in mind[,] import breadth of coverage"); *see also CSX Corp. v. U.S.,* 518 F.3d 1328, 1333 (Fed.Cir.2008) ("[T]he definition of wages in section 3121 of FICA encompasses 'a broad range of employer-furnished remuneration in order to accomplish the remedial purpose of the Social Security Act.'") (quoting *Assoc. Elec. Coop., Inc. v. United States,* 226 F.3d 1322, 1326 (Fed.Cir.2000)).

Turning then to the specified exceptions, only one exception in § 3121(a) arguably covers resident salaries. Section 3121(a)(20) exempts payments or other benefits that an employee reasonably believes are excludable from income under § 117. Section 117 excludes from income "qualified scholarships," 26 U.S.C. § 117(a), which it defines as "any amount received by an individual as a scholarship or fellowship grant to the extent that ... such amount was used for 'qualified tuition and related expenses.'" 26 U.S.C. § 117(b)(1). The statute explicitly excludes payments for teaching, research, or other services by the student required as a condition for receiving the qualified scholarship. § 117(c)(1). Although "scholarship" and "fellowship grant" are not defined, Treasury Regulation § 1.117–4 established a two-pronged "primary purpose test": (1) the primary purpose of the payment must be to enable the recipient to pursue studies or research and (2) the payment must not be compensation for services. 26 C.F.R. § 1.117–4(c).[6] In upholding the validity of Regulation § 1.117–4, Justice Stewart described a scholarship or fellowship as a "relatively disinterested, 'no-strings' educational grant[ ], with no requirement of any substantial quid pro quo from the recipients." *Bingler v. Johnson,* 394 U.S. 741, 751, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969).

Whether resident salaries are a "quid pro quo" for services has been extensively litigated. Prior to 1986, residents inundated the courts with cases arguing that their salaries were exempt from taxation. *See Zonderman v. Comm'r,* 36 T.C.M. 6, 1977 WL 3310 (1977). In cases that were largely fact-driven, courts overwhelmingly held that resident salaries were not scholarships or fellowships for purposes of § 117. *See, e.g., id.; Parr v. U.S.,* 469 F.2d 1156 (5th Cir.1972); *Hembree v. U.S.,* 464 F.2d 1262 (4th Cir.1972); *Wertzberger v. U.S.,* 441 F.2d 1166 (8th Cir.1971), *aff'g* 315 F.Supp. 34 (W.D.Mo.1970).[7]

---

**6.** 26 C.F.R. § 1.117–4(c) provides:

[A]mounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for [past present, or future employment services or represents

payment for services which are subject to the direction or supervision of the grantor].

**7.** Some courts openly expressed their frustration with these cases. The following passage from *Zonderman v. Comm'r of Internal Revenue* is particularly explicit:

Interns and residents have been flooding the courts for years seeking to have their remuneration declared a "fellowship grant" and hence partially excludable from income. They have advanced such illuminating arguments as they could have earned

In 1986, in response to the perceived unfairness of allowing scholarship recipients to avoid taxes on money used for nondeductible personal expenses, such as food and housing, Congress amended § 117 to apply only to the portion of scholarships and fellowships used directly for educational expenses. General Explanation of the Tax Reform Act of 1986 (H.R.3838, P.L. 99–514), Joint Committee on Taxation (May 4, 1987) (Pl.Ex. 9F at 99). Congress expected that the amendment would stem the tide of § 117 cases filed by residents:

> [N]umerous court cases have involved resident physicians and graduate teaching fellows who have sought—often notwithstanding substantial case authority to the contrary—to exclude from income payments received for caring for hospitalized patients, for teaching undergraduate college students, or for doing research which inures to the benefit of the grantor. The limitation on the section 117 exclusion made by the Act ... should lessen these problems of complexity, uncertainty of tax treatment, and controversy.

*Id.* at 100 (footnote omitted).

The change appears to have had the desired effect for about two decades. I have found no cases discussing whether resident salaries are scholarships for purposes of § 117 until the recent eruption of a new litigation campaign over the application of FICA taxes to resident payments. *See U.S. v. Mount Sinai*, 353 F.Supp.2d 1217, 1222 (S.D.Fla.2005) ("Mt. Sinai concedes that the salaries paid to its medical residents are not exempt from FICA taxation as scholarship proceeds under 26 U.S.C. § 117."), *rev'd on other grounds*, 486 F.3d 1248 (11th Cir.2007). More recently, differing approaches have developed between district courts in the Sixth Circuit. *Compare United States v. Detroit Medical Center*, 2006 WL 3497312, at *3–4 (E.D.Mich. Dec. 1, 2006) (holding that stipends paid to residents were not scholarships exempt from FICA under 26 U.S.C. § 3121(a)), *appeal docketed*, No. 07–1602 (6th Cir. May 17, 2007), *with United States v. University Hospital, Inc.*, 2006 WL 2129816, at *5 (S.D.Ohio July 26, 2006) (finding that whether stipends paid to medical residents are exempt under §§ 3121(a) and 117 is a question of fact).

Partners does not, and could not, argue that the salaries it pays to residents are qualified scholarships under § 117 or that the payments fall under the § 3121(a)(20) exception. Rather, it contends that payments to residents are *"in the nature of* 'scholarships or fellowships'" as defined by the regulations under § 117 (emphasis added), and thus are not "wages subject to FICA taxes." However, Congress did not exempt payments that are "in the nature of" scholarships or fellowships. As the statute itself makes clear, Congress exempted only scholarships and fellowships that meet certain qualifications: They must be used for "qualified tuition and related expenses." § 117(b)(1). In insisting that its resident salaries meet the Treasury Regulation definition of scholarships and fellowships under 26 C.F.R. § 1.117–4, but need not meet the statute's restrictions under 26 U.S.C. § 117, Partners attempts to create a loophole where

---

more elsewhere and they were enjoying a learning experience so therefore what they did receive must have been a grant. They have been almost universally unsuccessful and deservedly so. Why the amounts received by a young doctor just out of school should be treated differently from the amounts received by a young lawyer, engineer, or business school graduate has never been made clear.
36 T.C.M. 6, 1977 WL 3310 (1977).

none exists.[8]

*Bingler v. Johnson* is instructive. In that case, participants in Westinghouse's fellowship program argued that the payments they received from Westinghouse while on "educational leave" from their jobs constituted scholarships for purposes of § 117. 394 U.S. at 742, 89 S.Ct. 1439. Similar to the current case, the *Bingler* plaintiffs claimed that because the payments were intended to support them while they pursued a course of study and were not in exchange for services, they were exempt from taxation. The Supreme Court rejected that argument as creating "anomolous" results:

> Pay received by a $30,000 per year engineer or executive on a leave of absence would, according to that reasoning, be excludable as long as the leave was granted so that the individual could perform work required for a doctoral degree. This result presumably would not be altered by the fact that the employee might be performing, in satisfaction of his degree requirements, [work, the fruits of which] were made directly available to and exploited by the employer. Such a result would be anomalous indeed, especially in view of the fact that under § 117 the comparatively

modest sums received by part-time teaching assistants are clearly subject to taxation. Particularly in light of the principle that exemptions from taxation are to be construed narrowly, we decline to assume that Congress intended to sanction—indeed, as the respondents would have it, to compel—such an inequitable situation.

*Id.* at 751, 89 S.Ct. 1439. To avoid such "inequitable situations," the Supreme Court adopted the now well-established "quid pro quo" test for scholarships and fellowships. *Id.*

Partners contends that this case is distinguishable from *Bingler* because there is no quid pro quo. The evidence, however, shows otherwise. To be sure, Partners has produced evidence demonstrating that the primary purpose of the payments is to enable residents to further their medical training and education. *See* Weinstein Decl. ¶ 18; Thibault Decl. ¶ 11; Zinner Decl. ¶ 11; Resident Contract (Pl.Ex. 7 at 1–2). And the United States, although reserving the right to present contrary evidence, has offered no contrary evidence. Indeed, the United States agrees that residency programs are educational in nature. This, however, is not determinative.

---

**8.** Partners contends that noncompensatory scholarships or fellowships that are not "qualified scholarships" under § 117, and thus ineligible for the § 3121(a)(20) exception, are nonetheless excludable from FICA taxes. Partners does not offer any authoritative support for this proposition beyond a suggestion in a private letter ruling that Partners received with respect to research fellows. *See* PLR 199910047. I find it unnecessary, however, to determine whether such payments are FICA wages because it is clear that Partners' resident payments are compensatory. *See infra.* Partners claims that the FICA tax exception for scholarship and fellowships has been recognized for more than fifty years. It cites revenue rulings, private letter rulings, and Chief Counsel Advice ("CCA") memos.

D.'s Opp. to Motion for Summary Judgment at 6–7. None of these sources provide support for the Defendant's arguments. First of all, rulings, determination letters, and CCA memos cannot be used as precedential authority. 26 U.S.C. § 6110(b)(1)(A), (k)(3). Second, these sources are either based on obsolete law or do not involve medical residents. For example, Revenue Ruling 71–378, cited by Partners (D.'s Opp. to Motion for Summary Judgment at 6), involves an interpretation of § 117(b)(2)(B) as it existed in 1971. The provision discussed in that Revenue Ruling no longer exists: It was replaced by Congress in 1986, when amendments to § 117 introduced the "qualified scholarship" framework for excluding scholarships from gross income. Pub.L. 99–514, § 123(a) (1986).

Here, the quid pro quo lies in the fact that residents are required to provide patient care. The engagement contract that each physician signs upon accepting a resident position lists "provide patient care" as the first of residents' many responsibilities. Pl.Ex. 7 at 1–2. Partners presents substantial evidence demonstrating that a large portion of residents' activities have educational value, but it has produced no evidence suggesting that residents do not perform significant patient care services.

To the contrary, the Defendant's own evidence indicates that in Partners' residency programs, resident education and patient care services are inextricably intertwined. *See* Ausiello Decl. ¶¶ 21, 22 ("It is not possible to disassociate the clinical care component of training from medical education itself."); Warshaw Decl. ¶ 12 ("The patient care component is essential to the educational process."); Zinner Decl. ¶ 11 ("It is only through operative experiences that a resident can be appropriately trained as a surgeon."); Thibault Decl. ¶ 9 ("[S]upervised experience in direct patient care is essential."). Even if, as Dr. Warshaw declared, "[p]atient care is an incidental byproduct of the learning process," Warshaw Decl. ¶ 12, the evidence shows that it is not incidental to residents' education, and as a result, it is not incidental to Partners' residency program. In short, patient care may be a means by which

residents are educated, but it is also a service that residents are required to provide and for which they are compensated.

■ In sum, I conclude on this record that Partners' resident salaries are not scholarships or fellowships as defined by 26 U.S.C. § 117 and Treasury Regulation § 1.117–4. Partners concedes that the payments are not used for tuition and related expenses, and thus are not "qualified scholarships" exempt from FICA taxation under § 3121(a)(20). Even if I accept as true the questionable proposition that a noncompensatory scholarship need not meet the requirements of § 117 to be excludable, Partners' resident salaries represent a quid pro quo for patient care services and, therefore, qualify as FICA wages.[9]

## B. Student Exception

■ The term "employment" for FICA purposes is defined as "any service, of whatever nature, performed by an employee for the person employing him." 26 U.S.C. § 3121(b)(A). Known as the "student exception," § 3121(b)(10) excludes from that definition

> service performed in the employ of—(A) a school, college, or university ... if such service is performed by a student who is enrolled and regularly attending classes at such school, college, or university.

9. Partners argues that only the portion of the resident stipend that represents payment for patient care services may be considered FICA wages. Partners, which bears the burden on this issue, however, presents no evidence indicating what portion of each resident's salary might be deemed payment for services and what portion is purely educational. Indeed, it is unclear if any allocation would be possible in a setting in which the work and the education are inextricably intertwined.

Partners also contends that its payments to residents are not a quid pro quo because Medicare partially funds Partners' residency programs. This appears to be the contention that Medicare, not Partners, is therefore the grantor of the residents' salaries, and any quid pro quo is between Medicare and the residents. Although Partners offers evidence that Medicare provides funding for Partners' resident program, it presents no facts to support the contention that residents perform services for Medicare in exchange for payment from Medicare. In any event, the source of funds that Partners uses to pay its residents has no relevance to the present analysis.

Partners contends that medical residents' qualification for the student exception should be determined on a case-by-case basis, and it offers evidence to show that its residency program is a "school," and residents are "students" who are "enrolled" and "regularly attending classes" under the plain meaning of those terms. The United States argues that a fact-based analysis is unnecessary; it claims that the legislative history of § 3121(b)(10) indicates that medical residents are per se ineligible for the student exception.

Appellate courts addressing this issue recently have taken decidedly demanding approaches to the question and have declined to adopt any per se rule in this area. The Seventh Circuit, for example, held earlier this month:

> The student exception unambiguously does not categorically exclude medical residents as "students" potentially eligible for exemption from payment of FICA taxes.... This necessarily implies a case-specific analysis, not a categorical ineligibility for certain classes of employee-students.

*University of Chicago Hospitals v. United States*, 545 F.3d 564, 565 (7th Cir.2008); *see also United States v. Mount Sinai Medical Center*, 486 F.3d 1248, 1253 (11th Cir.2007) ("[A] case-by-case analysis is necessary to determine whether a medical resident ... qualifies for a FICA tax exemption pursuant to the student exemption....").

After an extended period of consideration, I have decided it would be imprudent to ignore those broad appellate holdings, albeit holdings not binding in this Circuit. It is apparent that fashioning and applying anything approaching a per se rule, whatever its merits, from the evolving developments in the student exception as applicable to residents since the enactment of the Social Security Act would be open to question. The issue must be resolved by formal fact-finding.

Accordingly I will deny summary judgment to the Government on the "student exemption" issue.

## IV. CONCLUSION

For the reasons set forth more fully above, I GRANT Plaintiff's motion for summary judgment on the "wages" issue and DENY the motion of the "student exception" issue. The Clerk shall set the case promptly for a further scheduling order looking to a prompt trial.